NATIONAL SURETY CORPORATION,
Plaintiff,

v.

INLAND PROPERTIES, INC., Trans-
american Marketing Corp., and United
Security Life Insurance Company, De-
fendants.

TANGLEWOOD APARTMENTS, INC.,
Plaintiff,

v.

NATIONAL SURETY CORPORATION
and Alice Conlin, Trustee, Defendants.

Nos. LR–66–C–147, LR–66–C–161.

United States District Court
E. D. Arkansas, W. D.

June 12, 1968.

Guy Amsler, Jr., of Barber, Henry, Thurman, McCaskill & Amsler, Little Rock, Ark., for National Surety Corporation, plaintiff in No. LR–66–C–147 and National Surety Corporation, defendant in No. LR–66–C–147.

Edward L. Wright, of Wright, Lindsey & Jennings, Little Rock, Ark., for United Security Life Ins. Co., defendant in No. L–R–6–C–147.

W. H. Arnold, Jr., of Arnold & Arnold, Texarkana, Ark., for Tanglewood Apartments, Inc., plaintiff in No. LR–66–C–161.

## MEMORANDUM OPINION

HENLEY, Chief Judge.

Subject cases involve, respectively, the Tanglewood Shopping Center and the Tanglewood Apartments, adjacent properties located in the City of Little Rock, Pulaski County, Arkansas. The plaintiff in one case is the defendant in the other. The cases have a good deal in common by way of background; they were tried to the Court without a jury within a few days of each other and were briefed over the same period of time. In such circumstances the Court deems it well to dispose of both cases in one opinion so as to avoid, insofar as possible, duplication of factual statements. This memorandum incorporates the Court's findings of fact and conclusions of law in both cases; a separate judgment will be entered in each case.

No. 147 is a suit at law for a money judgment brought by National Surety Corporation against Inland Properties, Inc., Transamerican Marketing Corporation, and United Security Life Insurance Company. Federal diversity jurisdiction is established in that case and is not questioned. Inland Properties and Transamerican Marketing Corporation did not defend the case, and default judgment will be entered against them. The real controversy is between National and United Security, and the question is whether that defendant is liable to plaintiff in the sum of $215,866 on a written contract of guaranty, alleged to have been executed on behalf of the defendant by its former president, W. L. DeLong.

No. 161 is a suit in equity brought by Tanglewood Apartments, Inc., against National for the purpose of compelling the latter as a third mortgagee either to redeem from a foreclosure sale procured by Tanglewood's assignor in a foreclosure action to which National was not made a party or to abandon all claims to the apartment house properties. It should be said that the Shopping Center is not directly involved in No. 161. Unquestionably, No. 161 involves the requisite amount in controversy to confer jurisdiction on this Court, and there is complete diversity of citizenship between the parties of record. However National challenges federal jurisdiction on the basis of 28 U.S.C.A. section 1359. The Court will discuss the jurisdictional problem in due course.

## I. *Factual Background*

Prior to 1965 an Arkansas corporation, Plantation House, Inc., undertook the construction of the Tanglewood Apartments and the Tanglewood Shopping Center at the intersection of Arkansas State Highway 10 and Mississippi Avenue in Little Rock. The project was ambitious and required extensive financing, which was furnished initially by the Republic National Bank in Dallas, Texas, apparently in collaboration with the Republic National Life Insurance Co. Republic National Bank held a first mortgage on the entire complex. Foundation Securities Corporation held a second mortgage on the Shopping Center, and John B. May Construction Co. of Little Rock held a third mortgage on the Center.

The contractors on the project were required to execute payment and performance bonds to insure that laborers and materialmen would be paid. National, which is a large corporation engaged in the business of writing such bonds for compensation, became the sureties on the contractors' bonds.

By January 1965 the overall project was in serious financial difficulty; the owner and the contractors were out of money and laborers and materialmen were not being paid. It thus became incumbent upon National under the terms of the payment bonds to satisfy lienable claims of suppliers but with a right of indemnity from the contractors.

As of that time the apartments were more or less substantially complete but the Shopping Center was not. Further, as of that time the contractors had in effect acquired control of the stock of Plantation House so that they were in reality the owners of the properties. In view of this amalgamation of the interests of the contractors and of the original owner, National took the position that it was under no further obligation to Plantation House on the performance bonds.

However, the Republic National Bank was threatening foreclosure which National was anxious to avoid at the time, and National induced the Bank to extend the obligations in its favor in consideration of National's guaranteeing that the work on the Shopping Center would proceed until the Center should be substantially completed.

As of the same time Plantation House seems to have been seeking to refinance the project, and in early 1965 was able to secure a loan of some $800,000 from John Hancock Mutual Life Insurance Co. of New York secured by a first mortgage on the apartments in lieu of the mortgage held by the Republic National Bank. And, Plantation House was also able to secure a $200,000 loan from Rosenthal & Rosenthal, Inc., factor financiers of New York City, to be secured by a second lien on the apartments.

As the year 1965 advanced National sustained losses amounting to $386,000 and additional losses were anticipated in view of National's undertaking with Republic National Bank to see to it that the Shopping Center was carried forward to substantial completion. Naturally, National was anxious to salvage as much of this loss as possible.

To stabilize the situation and as a stop-gap measure National secured from Plantation House a mortgage covering

both the apartments and the Shopping Center which obligation was guaranteed personally by the individuals who owned the controlling stock in Plantation House. That stock was also pledged to National. National's mortgage constituted a third lien on the apartments, being inferior to the John Hancock and Rosenthal liens; it was a fourth lien on the Shopping Center.

Throughout its dealings in connection with the Tanglewood operation National was represented by its regional claims manager, Mr. John E. Carruth of Dallas, Texas, an experienced man and a licensed attorney.

On November 7 or 8, 1965, Mr. Bruce Constant of Plantation House introduced Mr. Carruth to two men identified as Sy Pollack and J. Ernie Gaskin. Those two men held themselves out to Carruth as being individuals of great wealth and large business interests.

Pollack proposed to Carruth that one of Pollack's corporations, Inland Properties, Inc., purchase National's interests in the project for a cash price of $193,-000 plus an undertaking to save National harmless with respect to any further obligations to the Republic National Bank. The price was later increased to $226,000 to be paid on or before February 15, 1966.

Carruth advised Pollack that National would require collateral in addition to that which National held already and proposed in general to retain. Pollack immediately advised Carruth that he could obtain from United Security Life Insurance Co. of Birmingham, Alabama, a written guaranty, and that he would cause W. L. DeLong, United's president, to fly to Little Rock at once to confer about the matter.

DeLong did in fact fly to Little Rock and arrived here on the afternoon of November 8. He agreed orally to execute the desired guaranty, and a draft letter of guaranty was prepared by National's local attorney and delivered to DeLong, who flew back to Birmingham on the 9th taking the draft with him.

On November 18, 1965 Pollack again met Carruth in Little Rock and had with him a letter of guaranty written on the letterhead of United and purportedly executed by DeLong on behalf of his company. Carruth accepted the guaranty, and the sale of National's interests in the project to Inland Properties was consummated.[1]

The payment due from Inland Properties to National on February 15, 1966, was not made at that time or by any other time. On February 20 Carruth made by telephone a demand on DeLong as president of United. On March 7 Carruth saw DeLong in his office in Birmingham and served on him a formal demand on United that it honor its guaranty. DeLong put off Carruth, as he had done on February 20, and on March 8 DeLong took his own life.

In the meantime, Plantation House had defaulted with respect to its obligation to John Hancock, and Rosenthal was required to take over that obligation to protect its own second lien on the apartments. Plantation House also defaulted with respect to its obligation to Rosenthal and on March 28, 1966, that concern filed suit against Plantation House in this Court to foreclose the second mortgage.[2] Although Rosenthal was aware of National's third lien on the apartments, it chose not to make National a party to that suit, which fell to the docket of Judge Gordon E. Young. However, National was fully aware of the pendency and nature of the action and, as a matter of fact, through its attorney participated in the case to a limited extent in the early stages.

Judge Young appointed a receiver for the apartments, and the receiver filed an

1. The obligations of Inland Properties to National were later assumed by Transamerican Marketing Corporation. As stated, neither of those corporations made any defense in No. 147.

2. Rosenthal & Rosenthal, Inc. v. Plantation House, Inc., E.D., Ark., W.Div., Docket No. LR–66–C–53.

answer on behalf of Plantation House. Later on, Rosenthal moved for summary judgment, and the motion was granted on June 8, 1966. The apartments were sold, and Rosenthal became the purchaser at the sale. Prior to the execution of the Commissioner's Deed, Rosenthal caused Tanglewood Apartments to be formed as an Arkansas business corporation and assigned to Tanglewood its interest in the foreclosure deed; the Commissioner's Deed was executed in favor of Tanglewood on August 16.

During the same general period of time the creditors holding liens on the Shopping Center which were superior to the lien of National foreclosed those liens. National realized very little, if anything, out of the sale of the Shopping Center.

When subject cases were filed in July and August, 1966, Plantation House, Inland Properties, and Transamerican Marketing Corporation were all defunct from a financial standpoint; Pollack and Gaskin had been exposed as probable swindlers; and National had lost $400,000 or more in connection with the Tanglewood project. To recoup all or part of that loss National had nothing to look to except the purported guaranty of United and a third lien on the apartment houses, but with that lien being subject to the rights of Tanglewood which have been described. This litigation involves the efforts of National to collect on the contract of guaranty and to improve its position, at the expense of Tanglewood, with respect to the apartment house property.

So much for the background facts of both cases. The Court now turns to a discussion of the individual cases and in connection with that discussion will state additional facts peculiar to each case.

## II. *National v. United, No. 147*

The position of National in No. 147 is that the letter of guaranty upon which it relies is a binding obligation of United which that company must now discharge.

United denies that it is bound by the letter or contract of guaranty. It says that the contract was ultra vires and illegal; that it was supported by no consideration; that DeLong had no authority, real or apparent, to execute it; that the company derived no benefit from it, and that the company's board knew nothing about the transaction until after the death of DeLong. As a matter of fact, United formally denies that DeLong executed the letter, and in its answer asserts that DeLong's signature appearing on the letter is a forgery.

■ United's contention that the DeLong signature is a forgery is not supported by any evidence. United admits that the letter in question was written on a letterhead of the company, and that the signature appearing on the letter closely resembles that of DeLong. In such circumstances it is inferable that DeLong in fact signed the letter, and the Court finds that he did sign it.

■ The Court also finds that the letter was supported by legal consideration in that National was not willing to contract with Inland Properties without the guaranty, and did in fact rely on it to some extent, although National also had other security which it did not relinquish.

On the other hand, the Court finds that DeLong had no actual authority, express or implied, to make the contract, and that he had no apparent authority to do so. It follows therefore, that the complaint in No. 147 will be dismissed. Some comment and elaboration on those findings are in order.

United is an Alabama life insurance company authorized to write life insurance and related lines of insurance in Alabama; it is not authorized to do any kind of business in Arkansas; it is not authorized to write contracts of suretyship or guaranty in Alabama or anywhere else. The execution of this particular letter of guaranty was never authorized by the board of directors; nor was it authorized by the articles or bylaws of the corporation. No corporate

record of the transaction was made, and the board of directors knew nothing about it until after the death of DeLong.[3] Upon learning of what De-Long had done, the board promptly repudiated his act. United received no benefit whatever from the contract and was never intended to receive any.

■ Since United itself had no power to enter into any undertaking of guaranty, such as is involved here, it is clear that DeLong did not have and could not have had any actual authority, express or implied, to enter into the undertaking. With particular regard to the question of express authority, the Court finds from the materials before it that DeLong had been clothed with certain specific powers, but the Court is satisfied that the authority expressly invested in DeLong did not include the power to pledge the credit of his company to secure the debt of another corporation in a transaction entirely unrelated to the business of United.

■■ It follows that National must rely upon apparent authority, and the burden of proving such authority on the part of DeLong by a preponderance of the evidence is upon National. Apparent authority cannot be established merely by showing that DeLong claimed the authority or purported to exercise it. Apparent authority must be established by proof of something said or done by the principal on which statement or act the person dealing with the agent reasonably relies. Restatement, Agency 2d, § 8, Comments a–c; 3 Am.Jur.2d, Agency, §§ 73–75, and 78. Those principles are well established and conventional; there is no reason to suppose that they are not accepted in Alabama. Certainly they are included in the law of Arkan-

sas. Mack v. Scott, 230 Ark. 510, 323 S.W.2d 929; Ozark Mutual Life Association v. Dillard, 169 Ark. 136, 273 S. W. 378; Pierce v. Fioretti, 140 Ark. 306, 215 S.W. 646; J. H. Phipps Lumber Co. v. Omaha Hardwood Lumber Co., W.D. Ark., 40 F.Supp. 723, rev'd on other grounds, 8 Cir., 135 F.2d 3.

In *Fioretti*, supra, 140 Ark. at 313, 215 S.W. at 648, it was said:

"In 2 C.J. 573, we find the following, which we believe a correct statement of the law as to apparent authority: 'Apparent authority in an agent is such authority as the principal knowingly permits the agent to assume or which he holds the agent out as possessing; such authority as he appears to have by reason of the actual authority which he has; such authority as a reasonably prudent man, using diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess.'"

And in 3 Am.Jur.2d, supra, section 78, it is said:

"A third person dealing with a known agent may not act negligently with regard to the extent of the agent's authority or blindly trust the agent's statements in such respect. Rather, he must use reasonable diligence and prudence to ascertain whether the agent is acting and dealing with him within the scope of his powers. The mere opinion of an agent as to the extent of his powers, or his mere assumption of authority without foundation, will not bind the principal; and a third person dealing with a known agent must bear the burden of determining for himself, by the exercise of reasonable diligence and prudence, the existence or nonex-

---

3. It is to be noted that prior to the execution of the contract in suit Pollack, Gaskin, and DeLong had had rather extensive dealings together at the expense of United. Those transactions caused losses to the company mounting to at least $300,000, which sum came into the hands of Pollack and at least $50,000 of that sum was received by DeLong from

Pollack ostensibly to permit DeLong to retain possession of a private aircraft owned by him. The loss to the company was probably much more than $300,000; at the time of the trial of this case the affairs of United were being administered by a Judicial Agent appointed by the Alabama courts as a representative of the Alabama Insurance Department.

istence of the agent's authority to act in the premises. * * * "

██ National has not carried its burden of proof on the issue of apparent authority, and, on the contrary, the Court finds from a preponderance of the evidence that DeLong had no apparent authority in the premises on which Carruth or any other responsible representative of a bonding company like National, as a person of ordinary prudence, had any right to rely.

There is no evidence here that United ever held DeLong out as having authority to bind his company to an obligation of the kind with which the Court is concerned, or that DeLong ever before purported, on his own authority or otherwise, to execute such a contract. There is evidence that prior to the transactions here involved United had entered into a contract with one of the banks in Birmingham which may be characterized as a contract of guaranty. However, that contract was expressly authorized by the United's board of directors and was directly related to the business of United. Further, there is no indication that Carruth or any other representative of National had ever heard of that transaction prior to this litigation.

Between November 8 and November 18, 1965, Carruth and other National personnel made some inquiries as to the credit rating and financial standing of United; they made no effort to ascertain whether the company was authorized to enter into a contract of the kind contemplated or as to whether DeLong had authority to bind his company to such a contract. Any inquiry made in those areas, if pursued with any diligence, would have disclosed the lack of

the corporation's authority and the lack of authority on the part of DeLong.[4]

In short, National did not rely on anything said or done by United with respect to the propriety of the transaction or the authority of DeLong. Carruth, as National's responsible representative, simply relied on the fact that DeLong was president of United, that he claimed to have the authority in question and later purported to exercise it. In so doing Carruth did not act justifiably or with reasonable prudence, and National is charged with the consequences of his conduct.

██ It is well established that the president of a corporation does not possess, merely by virtue of his office, unlimited authority to manage the affairs of the corporation or to bind it to any type of contract which he may choose to make. 19 Am.Jur.2d Corporations, §§ 1169–1170. Generally, contracts of guaranty and suretyship not in the regular line of corporate business cannot be made by corporate officers without express authority; ordinarily there is no apparent authority in an officer to make such a contract. 19 Am.Jur.2d, supra, § 1183; 2 C.J.S. Agency § 106.

Mr. Carruth is something more than a mere man in the street dealing only occasionally with corporations and unfamiliar with corporate procedures. As stated, he is a lawyer and he was and is an experienced and knowledgeable individual in his field. As a lawyer and as an experienced agent for a large corporation he was charged with knowledge of the principles just stated.

Carruth knew, of course, that United was a life insurance company, and according to his own testimony he knew that the contract in suit would be a

4. E. F. Hill, the secretary of United, accompanied DeLong to Little Rock under the impression that the purpose of the trip was to advance the processing of an application for life insurance made by Pollack. He was introduced to Carruth and to others, but the question of United guaranteeing the obligation of Inland Properties to National was not discussed in his presence, and he knew nothing about it. He testified that had he known what was contemplated he would never have permitted DeLong to go through with the arrangement. It would have been easy for Carruth to have inquired of Hill about the propriety of the transaction and the authority of DeLong; he did not do so.

highly unusual one for a life insurance company to make. He even conceded that this is the only instance of which he is aware of a life insurance company making such a guaranty. That alone should have put him on inquiry as to whether his own company could rely safely on DeLong's undertaking.

More than that, Carruth was dealing with men with whom he was but slightly acquainted. The letter of guaranty was not mailed to any office of National; it was simply produced by Pollack when he reappeared in Little Rock on November 18.

The letter itself was a most informal document to serve as a vehicle for the expression of an undertaking so serious as an unconditional guaranty of the payment of an obligation of $226,000. It refers to no consideration moving to United, nor to any corporate action authorizing its execution. It was not attested by any corporate officer; it did not bear the imprint of the corporate seal; it was not even acknowledged before a notary public. The letter was not accompanied by any evidence of any authority on the part of DeLong to execute it; and the letter itself was no evidence of any authority on the part of DeLong. Indeed, for all Carruth knew at the time, the letter which Pollack produced might have been an utter forgery as United has contended that it was.

The Court recognizes that important corporate transactions are sometimes conducted informally, and the Court recognizes also that Carruth was engaged primarily in a salvage operation. But, in all of the circumstances of this case the Court thinks that Carruth, as a person of ordinary prudence, should have expected and insisted upon more than was furnished him by Pollack and De-Long as far as the evidence of the latter's authority was concerned.

While it is not necessary for the Court to explain the conduct of Carruth, it occurs to the Court that it is quite probable that he was simply taken in by Pollack, as the evidence indicates that others may have been; that Carruth thought that Pollack was a very wealthy man and expected that Inland Properties would make the necessary payment when it was due; and that the guaranty of United was really of secondary importance to Carruth so that he did not deal with it with the prudence and caution which he would probably have exercised in other circumstances and which he was required, in the Court's estimation, to exercise in this case.

The question of DeLong's authority has been briefed most thoroughly by counsel for National. The Court has given careful consideration to the arguments advanced and cases cited. The Court is not convinced by the arguments and does not believe that the result here reached is contrary to any of the authorities cited by counsel, including the cases abstracted in the annotation appearing in 34 A.L.R.2d 290 et seq., entitled "Authority of officer or agent to bind corporation as guarantor or surety." On the contrary, the Court's view of the matter finds full support in a number of those cases and in the principal case preceding the annotation, In re Union City Milk Co., 329 Mich. 506, 46 N.W.2d 361, 34 A.L.R.2d 283, a case which in a number of respects closely resembles this one.

The Court's findings and conclusions on the issue of DeLong's authority are dispositive of the case. Other contentions of United need not be discussed.

### III. *Tanglewood v. National, No. 161*

 The reason for No. 161 is to be found in two underlying principles of the Arkansas law of mortgages. Where a senior mortgagee, such as Rosenthal, elects to foreclose its lien without making a junior mortgagee, such as National, a party to the proceedings, the latter has a right to redeem from the foreclosure sale within a reasonable time. Skelly Oil Co. v. Johnson, 209 Ark. 1107, 194 S.W.2d 425; Harrison v. Bank of Fordyce, 178 Ark. 760, 12 S.W.2d 400; Prouty v. Guaranty Loan & Trust Co., 174 Ark. 19, 294 S.W. 362; Smith v. Simpson, 129 Ark. 275, 195 S.W. 1067;

Longino v. Ball-Warren Commission Co., 84 Ark. 521, 106 S.W. 682; Livingston v. New England Mortgage Co., 77 Ark. 379, 91 S.W. 752; Dickenson v. Duckworth, 74 Ark. 138, 85 S.W. 82; Allen v. Swoope, 64 Ark. 576, 44 S.W. 78. Further, a grantee of the mortgagor or a junior mortgagee is entitled to raise certain defenses which the mortgagor might have raised in the original proceedings, and that right is not necessarily lost because the grantee or junior mortgagee was not joined in the original proceeding and failed to intervene therein. See Billingsley v. Pruitt, 226 Ark. 577, 291 S.W.2d 498; Polster v. Langley, 201 Ark. 396, 144 S.W.2d 1063; Clark v. Lesser, 106 Ark. 207, 153 S.W. 112.

Where the junior mortgagee does not exercise his right to redeem and insists that the senior mortgage or the foreclosure sale thereunder was invalid, and that his interests are superior to those of the purchaser at the foreclosure sale or that the claimed interests of the latter are nonexistent, the position of the junior mortgagee can constitute a serious cloud on the title of the purchaser and those claiming under him. National has never, to the Court's knowledge, manifested any interest in redeeming from the sale in No. LR–66–C–53, and, as indicated, the purpose of No. 161 is to compel National to exercise its right of redemption within a time to be fixed by the Court or to suffer the entry of a final decree quieting the title of Tanglewood and its assigns and successors to the apartments free and clear of any claim of National and those in privity with it.[5]

National denies that Tanglewood is entitled to any relief on the merits. National contends also that the Court lacks subject matter jurisdiction, and that Tanglewood, as successor of Rosenthal, is precluded from maintaining the suit by virtue of Ark.Stats.Ann., § 64–1202.

*Jurisdiction.* Complete diversity of citizenship exists between Tanglewood and its assignees, on the one hand, and National, on the other hand. The problem arises from the fact that Tanglewood is an assignee of Rosenthal, and that there is no diversity of citizenship between Rosenthal and National, both being New York corporations.

Section 1359 of 28 U.S.C.A. provides that a federal district court "shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court." National contends that the assignment from Rosenthal to Tanglewood was a mere sham without any business actuality and was effected solely for the purpose of making available a federal forum for the litigation of the potential controversy involving National and to be described presently.

██ For a general discussion of the purpose, derivation, and legislative history of what is now section 1359 reference is made to 1 Barron & Holtzoff, Federal Practice & Procedure, § 26, pp. 155–156; 3 Moore's Federal Practice, 2d Ed., ¶¶ 17.05 and 17.06; and Wright On Federal Courts, § 31, pp. 85–86. When section 1359 is invoked against an assignee who has brought suit in a federal court, the question for determination is the genuineness of the assignment rather than its motivation. If the assignment or transfer is a bona fide, actual transaction whereby the transferee or assignee becomes the real party in interest, section 1359 is not applicable even though the transfer or assignment may have been motivated in whole or in part by a desire to create diversity of citienship for purposes of litigation. Bradbury v. Dennis, 10 Cir., 310 F.2d 73; City of Eufaula, Ala. v. Pappas, N. D.Ala., 213 F.Supp. 749; Hartmann Coal Mining Co. v. Hoke, E.D.Pa., 157

---

**5.** The record reflects that pendente lite Tanglewood transferred title to the apartment house property through mesne conveyances to a corporation known as Petron Enterprises, Inc.

F.Supp. 313; Steinberg v. Toro, D.C.P. R., 95 F.Supp. 791.[6]

 The burden is on the plaintiff to establish that jurisdiction exists, Thomson v. Gaskill, 315 U.S. 442, 62 S. Ct. 673, 86 L.Ed. 951, McNutt v. General Motors Acceptance Corporation, 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135; and the Court finds that Tanglewood has sustained that burden in this case.

The record reflects that Rosenthal is required in the course of its money lending business to borrow large sums itself to finance its operation. Its ability to borrow money depends in large measure upon the liquidity of its assets, and it prefers to have as few fixed assets as possible on its balance sheet. Hence, when Rosenthal is required, as here, to foreclose a real estate mortgage and where it bids in the property, its usual course of business is to cause another corporation to be formed to take and hold, at least temporarily, the title to the foreclosed property, executing in favor of Rosenthal a note and mortgage evidencing the amount bid for the property at the sale. The note and mortgage presumably are carried on the books of Rosenthal as current assets.

That course was followed in this case. As soon as Rosenthal bid in the property, it caused Tanglewood to be formed by one of its attorneys who immediately assigned all of the stock in Tanglewood to an individual associated with the Rosenthal corporate organization.[7] As soon as the Commissioner's deed was issued in favor of Tanglewood, that corporation executed a note and mortgage in favor of Rosenthal in the amount for which Rosenthal bid in the apartments. Tanglewood operated the properties un-

til they were transferred to Petron Enterprises, Inc. Tanglewood now holds a mortgage on the properties executed by Petron, and Rosenthal still holds the Tanglewood mortgage. It may be added that as additional security for the obligation owing to it Tanglewood received Petron stock in pledge; the pledge was foreclosed, and Imre J. Rosenthal, who has been mentioned, acquired the stock.

The Court finds that the assignment from Rosenthal to Tanglewood was actual, bona fide, and in the regular course of Rosenthal's business. According to the undisputed testimony of Rosenthal's general counsel, which the Court accepts, Tanglewood was formed and the assignment made without regard to potential litigation, and without any consideration being given to the fact that the assignment might create a federal forum for the conduct of litigation with National should such litigation materialize. Moreover, as has been seen, even if the transfer was motivated by a desire to create federal jurisdiction such motivation would not be sufficient to bring section 1359 into play.

 The Court has had occasion to mention the fact that Petron has now acquired title to the apartments. Some months before the trial Tanglewood moved that Petron be substituted as a party plaintiff. The Court denied the motion, but it was renewed in the course of the trial and ruling was reserved. The position of National is that Petron should not be substituted as plaintiff; National has no objection to Petron being added as an additional plaintiff. Petron's presence in the case will not affect jurisdiction one way or the other, and the Court thinks it proper to join

---

**6.** A comparable result has been reached in death actions in which a particular individual has been selected as the personal representative of the deceased for the express purpose of filing suit in a federal rather than in a State court. Stephan v. Marlin Firearms Co., 2 Cir., 325 F.2d 238; Lang v. Elm City Construction Co., 2 Cir., 324 F.2d 235; Janzen v. Goos, 8 Cir., 302 F.2d 421; County of Todd, Minn. v. Loegering, 8 Cir., 297 F.2d 470; Corabi v. Auto Racing, Inc., 3 Cir., 264 F.2d 784, 75 A.L.R.2d 711; Annotation 75 A.L.R.2d 717 et seq.

**7.** The individual to whom counsel assigned the Tanglewood stock was Imre J. Rosenthal, secretary of Rosenthal & Rosenthal, Inc. He owns no stock in that corporation but does own stock in another corporation of which Rosenthal & Rosenthal, Inc. is a subsidiary.

Petron as a plaintiff but without dropping Tanglewood from the case.

*Right of Tanglewood and Petron To Maintain The Action.* As pointed out heretofore, Rosenthal was and is a New York corporation. It has never qualified to do business in Arkansas as provided by Ark.Stats.Ann. § 64–1201, and National contends on the basis of section 64–1202 that Tanglewood and Petron as assignees of Rosenthal cannot maintain the action since Rosenthal did not comply with section 64–1201. Tanglewood and Petron deny that this contention has merit.

Section 64–1202 imposes pecuniary penalties on foreign corporations which "do business" in Arkansas without complying with section 64–1201; additionally section 64–1202 provides that such corporations may not sue in the courts of this State to enforce any contracts made within the State.

Section 64–1202 has been construed many times by the Supreme Court of Arkansas with some of the decisions being very recent. Brown Broadcast, Inc. v. Pepper Sound Studio, 242 Ark. 701, 416 S.W.2d 284; B. & P. Inc. v. Norment, 241 Ark. 1092, 411 S.W.2d 506; United Press International, Inc. v. Hernreich, dba Radio Station KFPW, 241 Ark. 33, 406 S.W.2d 322; and United Press International v. Hernreich bda Radio Station KZNG, 241 Ark. 36, 406 S.W.2d 317. It has been construed by the Court of Appeals for this Circuit in Hicks Body Co. v. Ward Body Works, 8 Cir., 233 F.2d 481, and by Judge John E. Miller of the Western District of Arkansas in Pellerin Laundry Machinery Sales Co. v. Hogue, W.D. Ark., 219 F. Supp. 629, and Pratt Laboratories v. Teague, W.D. Ark., 160 F.Supp. 176. It is discussed by Dean Leflar in The Law Of Conflict Of Laws, 1959, §§ 89–91; see also Leflar's comment in 18 Ark.L. Rev., No. 2, 135, 144. The governing principles may be summarized as follows:

▮▮▮ The statute is highly penal and is to be construed strictly. In order for a contract to fall within the sanction of the statute, it must appear not only that the contract was made by a nonqualifying foreign corporation which has "done business" in the State, but also that the particular contract in question was made in Arkansas.

▮▮▮ The statute applies to suits brought in the federal courts and to a suit brought by an assignee as well as to a suit brought by one of the original contracting parties. Noncompliance with the statute does not make the contract void; the statute does no more than render the contract unenforceable in the courts of the State.

▮▮▮ The statute does not apply to transactions and contracts amounting to interstate commerce. Nor does it apply to completed contracts. Where the contract of a nonqualifying foreign corporation has been performed fully so that property rights have vested, the offending corporation may protect those rights in the Arkansas courts so long as the protection does not necessarily or inevitably involve the enforcement of the basic contract.

With regard to the interstate nature of a transaction or contract, Dr. Leflar makes it plain that such nature is not changed merely because there may be intrastate activities which are purely incidental to or a continuation of the interstate transaction. Leflar, op. cit., pp. 171–172.

▮▮▮ Where a nonqualifying foreign corporation makes a loan outside the State, and where the obligation is payable in a State other than Arkansas, the transaction is regarded as amounting to interstate commerce and is not within the statute even though the obligation is secured by a lien on real or personal property in Arkansas. Public Loan Corporation v. Stanberry, 224 Ark. 258, 272 S.W.2d 694; Security Trust Co. v. Martin, 178 Ark. 518, 12 S.W.2d 870; Davis & Worrell v. General Motors Acceptance Corporation, 153 Ark. 626, 241 S.W. 44; Scruggs v. Scottish Mortgage Co., 54 Ark. 566, 16 S.W. 563.

When the facts in this case are considered in the light of the principles summarized above, the Court is convinced that section 64–1202 has no application here, and that National's contention based on that statute cannot be sustained.

To start with, Rosenthal has never maintained any office in Arkansas, has never had any resident or designated agent in the State, and, as far as the record shows, never made any loans secured by mortgages on Arkansas property other than the single loan involved in this case. Hence, it may be doubted that Rosenthal has ever done business in Arkansas so as to be subject to the sanctions of section 64–1202.

But, however, that may be, the Court is convinced that the statute is not applicable here for three reasons.

This is not a suit on the contract between Rosenthal and Plantation House. The Plantation House contract, that is to say the note and mortgage executed by Plantation House in favor of Rosenthal, became merged in the decree rendered by Judge Young in 1966. The rights asserted in this case are based on that decree and on the foreclosure sale held pursuant thereto, rather than on the original note and mortgage.

But even if it be assumed, contrary to what has just been said, that the suit is on the original contract, the Court finds that the contract was made in New York, and that section 64–1202 does not apply for that reason. On this point the evidence is undisputed that the loan was negotiated in New York, the note and mortgage were executed there, the loan was closed and the proceeds thereof were disbursed in that State, and the note was payable there.

In connection with the negotiations leading up to the making of the contract and in connection with the final closing of the loan Rosenthal necessarily had some contacts with Arkansas, but the Court is convinced that those contacts were not such as to convert the agreement between the parties into an Arkansas contract which would be affected by the statute.

Finally on this phase of the case, the Court is persuaded that under the Arkansas decisions heretofore cited the transaction between Rosenthal and Plantation House would be considered as amounting to an interstate transaction. Again the Court points out that the transaction necessarily involved Rosenthal in limited contacts with Arkansas, but those contacts were purely incidental to the making of a New York loan secured by a mortgage on Arkansas real estate.

This view does not conflict with the result reached by the Arkansas Supreme Court in B. & P., Inc. v. Norment, supra, wherein it was said that the taking of a note and mortgage on Arkansas real estate by a foreign corporation does not ordinarily constitute interstate commerce. The facts in that case were that the contract was actually made in Arkansas and was secured by a mortgage on Arkansas property. Earlier Arkansas cases heretofore mentioned were neither cited nor discussed.

As authority for the proposition that section 64–1202 is applicable here, counsel for National cites the very recent decision of the Supreme Court of Arkansas in Bowsher v. Digby, Judge, 243 Ark. 799, 422 S.W.2d 671. That case did not involve the statute relied on by National; rather the question was whether the out of State individual defendant was subject to personal service under the present Arkansas "long-arm statute," Ark.Stats.Ann. §§ 27–2501 to 27–2506. In Leflar, op. cit., pp. 173–174, the author speaking of the scope of section 64–1202 says: " * * * it is clear that more activity is required for this purpose than for the purposes of subjecting the corporation to taxation on its local activities *or to service of process on unauthorized agents.*" (Emphasis supplied.) The Court thinks the statement just quoted sufficient to distinguish this case from *Bowsher*.

*The Merits.* On the merits, National makes alternative contentions: First, that Rosenthal's note and mortgage were void on account of usury; Second, that even if the note and mortgage were valid the purchase of the apartments by Rosenthal had the effect of merging the mortgage lien and the underlying equity of redemption so that the third mortgage of National became in reality a second mortgage, inferior only to the claim of John Hancock. The Court considers those alternative contentions in inverse order.

In Kelly v. Weir, E.D.Ark., 243 F.Supp. 588, this Court had occasion to discuss in some detail the merger doctrine in Arkansas. It would prolong this opinion unduly to quote extensively from the Weir opinion or to paraphrase what was said in that case; the Court will content itself with making reference to the pertinent portion of that opinion, which portion appears at pages 598 and 599 of 243 F.Supp. In some instances where a mortgagee acquires the mortgagor's equity of redemption in the mortgaged property, the doctrine of merger will be applied so as to extinguish the mortgage debt and perhaps place the mortgagee in a position inferior to that of a junior encumbrancer. That is the application which National would have made of the doctrine in this case.

As pointed out in *Weir,* the doctrine of merger is not favored and will not be applied contrary to the intention of the mortgagee when he acquired the equity of redemption unless such application is called for by the equities of the particular case.

Here, it is patent that Rosenthal and Tanglewood never intended any merger of their interests into the equity of redemption so as to elevate National from the position of a third mortgagee to that of a second mortgagee with a lien superior to the title obtained by Rosenthal at the foreclosure sale and by it assigned to Tanglewood, and there is a complete absence of equities in the case which would require the application of the merger doctrine contrary to the plain intentions of Rosenthal and Tanglewood.

As to usury, there is no question that under Arkansas law the note and mortgage executed in favor of Rosenthal were usurious and void both as to principal and interest since Rosenthal was to receive interest at an effective rate in excess of the maximum rate of 10 percent per annum simple interest permitted by the Constitution and laws of the State of Arkansas. Ark.Const. Article 19, § 13; Ark.Stats.Ann. §§ 68–602, 68–604, 68–608, and 68–609 et seq.

On the other hand, it is clear that the note and mortgage would not be considered usurious under New York law. That is true because in New York the defense of usury is not available to a corporate debtor or its privies, including junior lien holders. New York General Obligations Law, McKinney's Consol. Laws, c. 24–A, §§ 5–501, 5–511, and 5–521(1); Union Dime Savings Institution v. Wilmot, 94 N.Y. 221, 46 Am.Rep. 137, commented upon in Stuart Court Realty Corp. v. Gillespie, 150 Va. 515, 143 S.E. 741, 59 A.L.R. 334. As construed by the New York courts, section 5–521 of the General Obligations Law makes it lawful for a corporate borrower to contract to pay interest at a rate in excess of the legal maximum rate of 6 percent per annum applicable to noncorporate borrowers; the section just mentioned is considered to be a substantive statute, not merely a procedural bar prohibiting corporations from pleading usury as a defense. National concedes that as far as New York law is concerned, the obligation in question was valid and enforceable.

The question of usury, then, boils down to one of conflict of laws, and in answering it this Court will apply the Arkansas law of conflict of laws. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477; McAvoy v. Texas Eastern Transmission Co., W.D.Ark., 187 F.Supp. 46; Leflar, op. cit., § 7.

In the fairly recent case of Credit Bureau Management Co. v. Huie, E.D.Ark., 254 F.Supp. 547, 554, this Court pointed out that in passing upon the validity of contracts in a context of conflict of laws the Supreme Court of Arkansas has applied a variety of rules and that there is a lack of complete consistency in the Arkansas cases. The Court then went on to cite Dr. Leflar's article in 18 Arkansas Law Review, supra, l.c. 140, in which that able conflicts scholar takes the view that in a case involving the validity of a contract and in which the Court has a legitimate choice of law, the Supreme Court of Arkansas will ordinarily make the choice which will uphold the contract unless to do so will involve enforcing an obligation which offends a strong public policy of the State, including its public policy against usury. The Court sees no occasion to dispute Leflar's appraisal of the Arkansas law in this area.

While the Arkansas public policy against usury is a strong one, it is not so strong that the Supreme Court of Arkansas will invariably apply Arkansas law to strike down the contract even though the contract would be enforceable if another appropriate choice of law were made. And Arkansas will not automatically apply its own law of usury to a transaction merely because the debt is secured by a mortgage on Arkansas real estate. Those principles are made clear by the decision of the Arkansas Court in Cooper v. Cherokee Village Development Co., 236 Ark. 37, 364 S.W.2d 158, a case which, like this one, involved a choice between New York law and Arkansas law.

In that case Northern Financial Corporation, a New York lending agency, made a loan to the Cherokee Village Development Co. of Sharp County, Arkansas, secured in effect by mortgages on lots in the Cherokee Village Development which Cherokee sold to individual purchasers. The loan bore interest at a rate of about 13 percent per annum. The loan was negotiated in both Arkansas and New York; it was actually made in New York, and the parties stipulated that New York law would be applicable; as Cherokee made collections from lot purchasers, the moneys would be deposited initially in an Arkansas bank, and daily remittances to New York were made; Cherokee received credit from Northern for those remittances three days after the remittances were received in New York.

The loan was usurious under Arkansas law but valid under New York law. Cooper, one of the stockholders in Cherokee, challenged the loan as being usurious and urged that Arkansas law was applicable. The Supreme Court of Arkansas rejected that contention. It was said (pp. 43–45 of 236 Ark., p. 162 of 364 S.W.2d):

"This agreement was drafted by the borrower, Cherokee, and offered to the lender, Northern, in New York. It was in New York that this contract was executed and delivered or where the last act necessary to complete the contract and impose legal obligations was consummated. The contract was made in New York. Leflar, Conflict of Laws, (1959) § 122; Restatement, Contracts, § 74; Williston, Contracts (3rd Ed.1957) § 97; Smith v. Brokaw [174 Ark. 609, 297 S.W. 1031], supra.

"As to performance, it is in New York where all advances, repayments and remittances are to be made and all collateral assigned. It is in New York that the contract is to be performed in the main or its essential features. American Farm Mortg. Co. v. Ingraham [174 Ark. 578, 297 S.W. 1039], supra.

"By the terms of the contract, it is the express intention of the parties that the laws of New York govern its validity. Cherokee and Northern had the right to select and intend the law of New York to govern the contract since New York has substantial contacts with the contract. McDougall v. Hachmeister, 184 Ark 28, 41 S.W.2d 1088, 76 A.L.R. 1463; Dupree v. Virgil R. Coss Mortgage Co. [167 Ark. 18,

267 S.W. 586, 1119], supra. Of course, they could not validly agree to such if New York had no substantial connection with the agreement.

\* \* \* \* \* \*

"(5) This court has consistently inclined toward applying the law of the state that will make the contract valid, rather than void. Whitlock v. Cohn, 72 Ark. 83, 80 S.W. 141; Dupree v. Virgil R. Coss Mortgage Co., supra; American Farm Mtg. Co. v. Ingraham, supra; Wilson-Ward Co. v. Walker, 125 Ark. 404, 188 S.W. 1184.

"This is not a case of a cloak for usury or where the parties to a wholly Arkansas contract have sought to avoid the Arkansas usury law by having the validity of the contract determined by the law of a state having no substantial connection with the contract. On the contrary, this is essentially a New York contract. It is quite natural for a New York lender to loan its money in New York, to require it to be repaid in New York and to stipulate that the contract be governed by familiar New York law. These are *reasonable requirements* for a lender to exact.

"The parties in this case were dealing fairly with each other with full disclosure. Cherokee drafted the agreement and presented it to Northern for acceptance. Cherokee reserved the right to terminate the agreement on thirty (30) days notice if it were able to obtain the required refinancing from commercial banks, other institutional lenders, or public financing. We see nothing so reprehensible about this agreement that it would require us to discard our recognized rules of conflict of laws in order to hold the agreement to be void."

■ In connection with the Court's discussion of National's contention based on Ark.Stats.Ann. section 64–1202, it was shown that the Rosenthal loan was negotiated in New York, that the note and mortgage were executed in that State, that the note was payable there, and that the loan was closed and disbursed there. There remains to be added the fact that the parties expressly stipulated that their rights and obligations under the note and mortgage would be governed by New York law. When that factual addition is made, the comparability of this case to the Cooper case, supra, becomes obvious.

The evidence discloses that very early in 1965 Rosenthal was approached by a representative of a loan brokerage concern seeking to obtain a loan for Plantation House. New York counsel for Rosenthal were well aware of the difference between the New York law of usury and the law of Arkansas on that subject. Rosenthal was willing to make the loan if, but only if, it could obtain an effective rate of interest in excess of 10 percent per annum with the loan secured by a mortgage on the apartments which would be enforceable in the courts of Arkansas.

New York counsel for Rosenthal contacted Arkansas counsel and were advised that if the loan was closed in New York, if the note was made payable there, and if the parties agreed that New York law would govern as far as the validity of the obligation was concerned, the courts of Arkansas, in the opinion of Arkansas counsel, would enforce the note and mortgage notwithstanding the fact that the obligation would be tainted with usury under Arkansas law. It is fairly inferable that the able Arkansas attorney who gave this advice to his New York colleague was familiar with *Cooper* and based his advice and suggested procedure on the opinion in that case. That procedure was followed to the letter.

The argument is made that the procedure adopted was merely a "device to evade" the usury laws of Arkansas and should not be permitted to have that effect in view of Arkansas' strong public policy against usury. The Court thinks that the same argument could have been made, and perhaps was made in *Cooper*. In the light of the holding in *Cooper* and in the light of the facts in this case the argument is unsound.

It is true, of course, that whenever contracting parties stipulate that their contract is to be governed by the law of one State rather than by the law of another State, or whenever they consciously act in a manner so as to bring into play the law of one State in preference to the law of another State, it may be said that their stipulation or conduct is a "device to evade" the law of the other State, but to so characterize their stipulation or conduct does not invalidate it. *Cooper* makes it clear that parties have a right to contract as to governing law so long as the chosen body of law bears a reasonable relationship to the contract. See also Lyles v. Union Planters National Bank, 239 Ark. 738, 393 S.W.2d 867.

Rosenthal was not required to make any loan to Plantation House; it had a right to stipulate as a condition to making the loan that the rights of the parties be governed by a body of relevant law which would permit the lender to receive a higher rate of interest than permitted by the law of Arkansas.

Plantation House was not defrauded or overreached; its representatives knew that the borrower was being required to pay more than 10 percent interest and that the transaction was to be handled in such a way that the obligation would be legally enforceable notwithstanding the Arkansas law. Plantation House was not required to take the loan, although it was probably under an economic compulsion to borrow money from some source. Plantation House wanted the money and obtained it on Rosenthal's terms.

In the Court's view, the claim of usury could not have been advanced successfully by Plantation House in the original foreclosure suit. The claim has less appeal when advanced here by National. National has borrowed no money from Rosenthal; it has not been charged any interest by Rosenthal. To sustain National's defense would not only be unjustified in the light of *Cooper* but would also be to give National a $200,000 windfall at the expense of a senior mortgagee's successor in interest. The Court is not saying that National does not have "standing" to raise the usury questions; the Court means simply that there are no compelling equities here in favor of National which would lead the Court to predict that the Supreme Court of Arkansas would not follow *Cooper* in this case on the same record as is before this Court.

Counsel for National contends earnestly that *Cooper* is factually distinguishable from this case and, indeed, has sought to undermine the authority of the Cooper case as a precedent. The Court has considered counsel's arguments and does not accept them.

It follows that National must now elect whether to redeem from the foreclosure sale or simply abandon its interest in the properties. Counsel for Tanglewood suggests that 30 days is an adequate time within which National should exercise its option. Counsel for National contends that 30 days is an inadequate period.

Both of these cases have been pending for substantially more than a year. It must have been clear to National's policy makers that National might win both cases, or that it might lose both, or that it might win one and lose the other. The Court presumes that National has been giving consideration to the course which it will pursue in any of those contingencies, and the Court does not think that National will need more than 30 days within which to make its election in this case.

The decree to be entered in No. 161 will declare the rights of the parties and will allow National 30 days within which to effect a redemption. If no redemption is effected within that period of time, a final decree will be entered without further notice unless in the meantime it is made to appear to the Court that additional time or additional proceedings are necessary. The Court's decree will reserve jurisdiction for all appropriate purposes.