EAGLE PROPERTIES, INC. *v.* WEST & *Co.* OF LA., INC.

5-4146                                    412 S. W. 2d 605

Opinion delivered March 20, 1967

*Leon B. Catlett.* for appellant.

*Lesly W. Mattingly* and *John T. Campbell,* for appellee.

CARLETON HARRIS, Chief Justice. Eagle Properties, Inc., appellant herein, instituted suit in the Pulaski Chancery Court (First Division) against West and Company of Louisiana, Inc., appellee herein, praying the court to remove an alleged cloud on its title to certain real property located in Pulaski County. The property is. the site of a proposed shopping center being developed by appellant. The alleged cloud is an instrument entitled "Lease Agreement (Short Form)," executed by the parties, and recorded in Pulaski County. The recorded lease was a brief memorandum of a lengthy instrument entitled "Lease Agreement." These instruments had reference to the proposed lease of a store building to be constructed by Eagle Properties, Inc., for the use and occupancy of West and ·Company. In its suit, appellant alleged that the lease was void, and had never become effective; that appellee had refused to execute an instrument acknowledging that the lease was void, and thus refused to remove the cloud from appellant's title. It was asserted that this refusal had damaged appellant in the amount of $95,000.00.[1] After the filing of several preliminary pleadings, appellee answered, contending that it had complied with the lease agreements, and that the same were still in full force and effect. On trial, the court found that the lease was null and void, and of no effect, and that it should be removed as a cloud upon appellant's title to the real estate involved. The prayer for damages against appellee was denied. Appellant appeals from that portion of the decree denying damages, and appellee cross-appeals from the finding holding the lease to be null and void. We proceed to a discussion of these contentions.

The evidence reflects that Eagle Properties, Inc., acquired some forty-one parcels of land, over a period of two years, at the southeast corner of Interstate 30

---

[1] In its proof, appellant contended for damages in the sum of $26,500.00.

and Geyer Springs Road for the purpose of developing a shopping center, which, to begin with, was to have 100,000 to 120,000 square feet in gross leasable area. In May, 1964, a representative of appellee company contacted William V. Richards, President of appellant company, with regard to obtaining a possible location in the proposed shopping center, and in October, Richards was contacted by Mr. H. O. West, Chairman of the Board of the West Company, relative to obtaining space. After quite a bit of correspondence between Richards and West, and a visit to Little Rock by West and associates, Richards made a trip to Minden, Louisiana on December 1, 1964, where he met with H. O. West and his son, Claude West, and a discussion was held preparatory to reaching an agreement between the parties. Upon his return to Little Rock, Richards received from West a memorandum of what had transpired at the December 1 meeting. Appellant's attorney prepared a lease, incorporating certain provisions agreed upon during negotiations, and also incorporating some provisions of a blank lease submitted by West, which the appellee company had used when placing stores in other shopping centers. This lease was signed by West on April 7, 1965, and was thereafter executed by the Eagle Company, a short form being recorded in the office of the Pulaski County Recorder. The complete instrument is composed of 37 sections, but only a few of those sections are actually pertinent to this litigation, and argued by the attorneys in their briefs. Among other provisions are the following:

"5. Lessor, before submitting the final plans and specifications to the Department of Housing and Building, or other proper authority, shall submit them to Lessee for its approval and such approval must first be obtained, otherwise this lease shall be null and void.

"6. All said plans and specifications, both preliminary and final, are to be considered as a part of this agreement as if incorporated herein, the said work of actual construction to be commenced on or before April

15, 1965, and the building completed on or before January 1, 1966."

\* \* \*

"7. \* \* \* If, for any reason beyond its control, Lessor fails to deliver possession of the demised premises, properly completed and made ready for occupancy in conformance with the final approved plans and specifications, to Lessee within the said thirty (30) days, Lessee shall take possession of property within six (6) months after completion, and rental to start as outlined in Paragraph 3. If building is not completed in two (2) years, this lease is cancelled."

\* \* \*

"9. Before this lease shall become effective, Lessor shall furnish to Lessee without cost to Lessee: (a) proof satisfactory to Lessee that Lessor's title is good and merchantable; and (b) an agreement executed by the mortgagee in form satisfactory to Lessee, subordinating each mortgage affecting said premises to this lease."

"31. It is agreed and understood that the legal effectiveness of this lease is predicated upon Lessor's consummation of leases with a supermarket, a chain variety store, a drug store and other stores with a total floor space (including the demised premises) of four times the space signed by Lessee in the shopping center prior to July 1, 1965. In the event the Lessor fails to consummate such leases by said date, it shall give Lessee notice thereof by registered mail and thenceforth this within lease may be cancelled at the option of Lessee. Lessee must give notice of its decision in sixty (60) days from receipt of notice."

Almost from the beginning, the parties seemed to have difficulty in reaching actual agreement on the building that was to be constructed. For instance, on June 7, 1965, West wrote Richards as follows:

"We received a skeleton copy of the architects drawing of our building in the Windamere Shopping

Center and it is no different from a sketch that he sent us previously and we had written him to tell him how we wanted the building fixed, sending him a drawing, but he insists on fixing it like he wants it.

"I don't believe it is your intention to require us to take a building like the architects wants us to, but we want it like our plans we sent him sometime ago, and we would appreciate your talking to the architect about this as we do not want the building fixed as he has it outlined.

"If there is any additional information you want on this, please let us hear from you, but we expect the building to be built in accordance with the way we had it drawn on the sketch we sent him. The difference is, the building we sent was for a 12,000 foot building and yours is for a 15,000 foot building. The only thing that would be different would be the width of the stockroom and the double deck stockroom floor."

Richardson replied that he would make a trip to Minden within a few days to see if the matter could be straightened out. Appellant's president, however, testified that the parties were unable to agree as to the building, the chief difficulty being that West insisted on a balcony, which Richardson said had never been discussed, and which the president emphasized could not have been installed to suit West without destroying the entire concept of the center.

"You would either have to raise the roof, or dig down and lower the floor, which that soil out there has a high water table and it is just prohibitive, the cost, and it would ruin the whole concept and design of the center itself."

On July 28, appellant's architect received a letter from West complaining that the office was on the opposite side of the building from which he (West) wanted it; that it would not be satisfactory to omit the double

deck stockroom area; that appellee wanted the show windows just as they had stated in their original plan; that the front doors were 19½ feet apart, while West wanted them to be 10 feet apart; he stated that these changes would have to be made in order to make the building satisfactory. Following receipt of this letter from West, no additional plans were submitted, and, on December 11, 1965, appellant advised appellee that it would be unable to complete the shopping center project; and that all leases in the center were being cancelled. Soon thereafter, an instrument cancelling the lease was forwarded to West, but the latter did not execute it.

It is the contention of appellee that the lease is still in effect, while appellant contends that its cancellation was entirely proper and in conformity with Section 5. It is true that no *final* plans and specifications were submitted to appellee, but appellant maintains that this would have been a useless act, since it was quite obvious, from prior conversations and correspondence, that the parties were "poles apart," and would never be able to reach an agreement as to the kind of building to be constructed.[2] Appellant's witnesses (officers and architect) were adamant in their view that to meet West's request would simply destroy the type of shopping center they proposed to construct. We have held that the law does not require the performance of a useless act. *Doup* v. *Almand*, 212 Ark. 687, 207 S. W. 2d 601. After a study of the record, and the lengthy testimony therein, we are convinced that, under the views maintained by the respective parties, no agreement could have been reached, and the preparation, and transmittal to West of further plans would have been to no avail. We have accordingly concluded that the court was justified in cancelling and setting aside the instrument here involved.

[2]Appellant did not comply with Sections 9 and 31, and this fact is mentioned by appellant itself, but, in its brief, appellee states that it "could not complain of Appellant's failure to meet the conditions set forth in Article 9 or 31 until the lease became effective. Thus, any claim with respect to either Article 9 or 31 is at this time premature." This statement by appellee is somewhat in conflict with its contention that it has an effective lease.

We likewise agree with the Chancellor that appellant was not entitled to damages. For one thing, damages were not properly proved. Mr. Richards appraised the value of the shopping center at $780,000.00, and his damage, since December 15, 1965 (apparently using this date as the date West refused to cancel the lease on record), as follows:

"Conservatively estimated at six per cent interest, which is very conservative in today's money market, on such a value as I mentioned, $780,000.00, $23,000.00 in interest alone that we have had to pay since it has been tied up, and one-half year's taxes. I had them computed on all the pieces of property.

\* \* \*

Q. Then you are testifying with reference to the damage resulting by virtue of the fact that you can't use or sell the property?

A. Yes, sir. Also the taxes which I prorated for six months, $3,500.00. Now this doesn't take into consideration any time or loss of revenue because the Center hasn't been under way.

Q. The total of those two figures is how much?

A. Well, that would be $26,500.00."

However, the figure used ($780,000.00) was not the purchase price of the property, but only Richards' idea as to the value. "That is the value of this property and it is *very near* (emphasis supplied) the purchase price of it." Of course, the 6% interest figure was likewise simply a figure that Richards considered "conservative." Subsequently, Richards testified:

"Normally, if you were to appraise the property, of course, you would use two basic approaches. Your income approach, which would be based upon a rental value of the property, which I would say would be six

percent net on the total investment. The total investment being $750,000.00, six percent net on that. The taxes and rest of it would be paid above that. The only other way that you could appraise it would be on comparable basis of market values of centers such as this and they have been going anywhere from $20,000.00 to $40,000.00 an acre.''

It will b. noted that there is nothing definite about the figures given, nor does this testimony conform with his earlier evidence. The witness testified that two Little Rock businessmen had expressed an interest in purchasing a 75% interest in the land, but would take no definite steps as long as the lease was on record, and that these two businessmen had an option to purchase this interest.[3] Of course, the mere fact that a person or concern has an option to purchase property does not mean that the option will be exercised. In fact, frequently options are not exercised. Not only that, but Richards' testimony on this point was indefinite in other respects, and it appears that there were other conditions to be met before the Little Rock businessmen would consider consummating the transaction. In other words, the testimony as to the contemplated sale was vague, and the outcome doubtful. Damages cannot be allowed "where they are speculative, resting only upon conjectural evidence or the individual opinions of the parties or witnesses." *Harmon* v. *Frye,* 103 Ark. 584, 148 S. W. 269. It might also be mentioned that, while we agree, as heretofore stated, that the sending of final plans by appellant would have constituted a useless act, still, the lease provided that this be done, and West testified that he had consulted his attorneys, and had been advised that his lease was still in effect. Under these circumstances, it can hardly be said that appellee's refusal was malicious, arbitrary, unreasonable, or even unjustified.

Finding no erro. on either direct or cross-appeal, the decree of the Pulaski Chancery Court (First Division) is affirmed.

[3]These businessmen did not testify.