ROBERT MARK HIGGINS *v.* ELLIOTT'S FEED, SEED & FERTILIZER CO.

5-5160                                          451 S. W. 2d 884

Opinion delivered April 6, 1970

*Rieves & Rieves,* for appellant.

*Schieffler & Murray,* for appellee.

J. FRED JONES, Justice. A truck and trailer rig belonging to Elliott's Feed, Seed & Fertilizer Co., Inc. was damaged in a collision with a vehicle belonging to Robert Mark Higgins. Elliott's, Inc. sued Higgins in the St. Francis County Circuit Court for $2,686.43 in damages based upon the difference in the market value of the vehicle immediately prior to and immediately after the collision. Elliott's, Inc. subsequently amended its complaint alleging and praying as follows:

> "That as a direct and proximate result of the defendant's negligence, the plaintiff sustained damages in the amount of Three Thousand Seven Hundred Twenty and No/100 Dollars ($3,720.00) as a result of the lack of business earnings due to the out of service time for the tractor and trailer being out for repairs. That the Three Thousand Seven Hundred Twenty Dollars ($3,720.00) is in addition to the Two Thousand Six Hundred Eighty-Six and 43/100 Dollars ($2,686.43), which represents actual property damage to the tractor and trailer."

Higgins demurred to so much of the amended complaint as pertains to the loss of earnings as an element of damage and the demurrer was overruled by the trial court. Elliott's, Inc. conceded in its brief that the trial court was correct in overruling the demurrer, so the question on demurrer is no longer involved in this case. At the close of the evidence offered by Elliott's, Inc., Higgins filed a motion for directed verdict as to the elements of alleged damages because of loss of use of the truck, and this motion was also overruled by the trial court. The case was submitted to the jury on interrogatories and over the objection of Higgins the court gave to the jury instruction 18, as follows:

"If an interrogatory requires you to assess the damages of Elliott's, Inc., you must then fix the amount of money which will reasonably and fairly compensate Elliott's, Inc., for any of the following elements of damages sustained:

1. The difference in the fair market value of its 1964 International tractor-trailer immediately before and after the occurrence. In determining this difference you may take into consideration the reasonable cost of repairs.

2. The value of any earnings or profits or working time lost. Whether any of these elements of damages have been proved by the evidence is for you to determine."

On special interrogatories the jury found that Elliott's, Inc. had suffered total damages in the amount of $4,936.43; that Higgins was guilty of 85% of the negligence causing the damage and that Elliott's, Inc. contributed 15%. The trial court diminished the total amount of damages by 15% and entered judgment in favor of Elliott's, Inc. against Higgins for $4,195.96 and costs. Higgins has appealed to this court and relies on the following point for reversal:

"The court erred in refusing to direct a verdict on that portion of the complaint pertaining to a loss of business earnings and in giving instruction numbered 18 (2) over appellant's objection."

Higgins argues in his brief that when the actual cost of repairs in the amount of $2,686.43 is subtracted from the total amount of damages found by the jury in the amount of $4,936.43, the resulting amount of $2,-250 was obviously awarded by the jury for lost business earnings; and, Higgins contends that this court on appeal, should reduce the judgment by that amount. In support of the error alleged in overruling his motion for a directed verdict, Higgins only argues that the testimony relating to loss of use is too speculative and

conjectural to support a verdict including that element of damage. We agree with Higgins that the trial court erred in refusing to grant the motion for a directed verdict on the record of evidence presented here, and we are also of the opinion that the record requires a reduction in the amount of the judgment if it is to be affirmed.

Mr. Elliott testified that he owns and operates the corporation bearing his name and that the damage to the truck was repaired at a cost of $2,686.43. He testified that the corporation owned another truck besides the one that was damaged and that he had a verbal contract with Riviana Foods to use both trucks in hauling rice from Carlisle, Arkansas, to Memphis, Tennessee. He testified that because of the damage to the truck, half of his "fleet" was put out of business. He says that the damaged truck was grossing $100 per day; that it was out of operation for a period of 45 days while being repaired, and that his net loss in business profits during this period, including his loss in hauling his own rice, amounted to $3,720.

Mr. Brown, who was in charge of the repairs on the truck, testified that the repairs were delayed "possibly three weeks at least" because a part needed in repair of the truck was ordered from Michigan and the wrong part was sent. No one would seriously contend that Higgins should be liable for the negligence of whoever was responsible for the delay caused by the wrong part being sent from Detroit.

As we view the evidence, Mr. Elliott's testimony as to loss of business, stated a conclusion not supported by competent substantial evidence. To permit such conclusion to stand as evidence substantial enough to support a judgment, would be giving the injured party an unfair advantage over a tort feasor amounting almost to blank check authority, which the law could not long tolerate nor industry long endure.

The insubstantial nature of Mr. Elliott's testimony

as to lost profits, is most evident from his answers on cross-examination, so we quote rather liberally therefrom. On cross-examination Mr. Elliott testified, in part, as follows:

"Q. Mr. Elliott, what was the terms of your contract with Riviana Foods?

A. I was to haul all their rough rice from Carlisle to Memphis that I could, and then if they needed any extra trucks, or I couldn't get it there quick enough, or enough, they would hire a few extra trucks to help until we got caught up.

Q. Now, were you to do this every day of the year?

A. Well, anytime they wanted me to haul; usually that time of year we was real busy, because it was right after harvest, and they was needing to move rice into Memphis, into the mill.

Q. Do you have an accurate record of the number of days you hauled for Riviana in 1967?

A. Well, no; I do have it in my office, but I do know we are real busy hauling in December, January, and February.

Q. You are busy hauling, but have you consulted those records before coming in here today?

A. Yes, sir, I looked at them, but I can't remember just what it was.

Q. Well, then, if you will, tell us how you arrived at this figure of $3,720?

A. Well, my truck was grossing, one day we would haul one load, and next day we would get two, and my truck was averaging grossing $100.00 a day, and my truck was out 45 working days, besides the hauling that I missed for my own business.

Q. Now, over that period of 45 working days, how many loads did you turn down for Riviana, how many days did they request you to haul grain for them that you had to say you could not do it?

A. During this time?

Q. Yes.

A. Well, I just told them I couldn't run this one rig, I run my other rig, and they hired more trucks and put on the haul.

Q. Where did they hire those trucks?

A. I don't remember; I think Stuttgart, maybe over at Hickory Ridge; they hired some out of both areas.

Q. But, you have really no idea, with no degree of certainty, can you tell us how many actual loads you had to turn down as a result of this truck being out of commission?

A. Well, no, sir, but my truck, I have the record to prove that my other truck run most all of this time.

Q. Where are those records?

A. They are in my office.

Q. And those records have what you have used to come in here and testify with today?

A.  Well, yes, sir."

As to the truck operating expense, in arriving at *net* profit, Mr. Elliott testified on cross-examination as follows:

"Q.  Now, if you will, I believe you testified that you arrived at this on the basis of grossing $100.00 a day for 45 working days; now, that is a total of $4,500; you have testified that you lost $3,720; that is $780 difference; tell the jury how you arrived at that $780.

A.  Well, that was my expenses, plus I figured in there what I lost because I was running the truck for myself on Saturdays, and sometimes Sundays, that I lost; I had to have it hired.

Q.  Well, give us a breakdown on the $780.00.

A.  Well, that's the driver, gas, plus this other that I lost, that I couldn't haul for my own firm.

Q.  How much does it cost for fuel on this run from Memphis to Carlisle and back?

A.  Well, off-hand I don't know.

Q.  How much do you have to pay for a driver from Carlisle to Memphis and back?

A.  Well, that depends, too; you have to pay $1.60 an hour; it's hard to tell, sometimes if they get unloaded they are not gone near so long.

Q.  Well, what was your average driver expense per trip from Carlisle to Memphis and back?

A.  I don't remember.

Q.  You don't know?

A.  No, sir, I don't.

Q.  Okay. Now, how much did your truck depreciate, that truck from Carlisle and back?

A.  I don't know, I really don't.

Q.  Well, then, will you tell us how you have come in here and told us it cost you $780.00?

A.  Well, I took a pencil and piece of paper and figured it out, but I don't remember.

Q.  Can't you tell us how you figured it out?

A.  Well, I figured my fuel, my driver, my expenses on it.

Q.  But, you don't remember what it takes for fuel, what it takes for driver?

A.  No off-hand I don't.

Q.  When did you do this figuring?

A.  Oh, I've done it several times off and on.

Q.  Since the lawsuit was filed?

A.  Well, I've done it before that.

Q.  You have?

A.  Yes, sir.

Q.  And yet, this being your business, you can't

give us any idea as to what any of these items cost?

A.   Not off-hand I can't."

*Harmon* v. *Frye,* 103 Ark. 584, 148 S. W. 269, was a suit on a *breach of contract* and the appellee was allowed to show lost profits as an ·element of damage. In that case, quoting from· 13 Cyc. 53-54, this court said:

> "Such damages 'must be certain both in their nature and in respect to the cause from ˙ which they proceed. It is against the policy of the law to allow profits as damages, where such profits are remotely connected with the breach of contract alleged, or where they are speculative, resting only upon conjectural evidence, or the individual opinions of the parties or witnesses.' 13 Cyc. 53, *Spencer Medicine Co.* v. *Hall,* 78 Ark. 336; *Beekman Lbr. Co.* v. *Kittrell,* 80 Ark. 232; *Hurley* v. *Oliver,* 91 Ark. 433."

In *Sumlin* v. *Woodson,* 211 Ark. 214, 199 S. W. 2d 936, there was an attempt to recover lost profits as an element of damage in an unlawful detainer case, and in that case this court said:

> ". . . When a party embarks on the enterprise of recovering anticipated profits, he must present a reasonably complete set of figures, and not leave the jury to speculate as to whether there would have been any profits."

See also *Missouri & Arkansas Railway Co.* v. *Treece,* 210 Ark. 63, 194 S. W. 2d 203; *Eagle Properties* v. *West & Co.,* 242 Ark. 184, 412 S. W. 2d 605.

The only testimony offered in support of a showing of lost profits in the case at bar was the testimony of Roy Elliott, owner and operator of Elliott's, Inc. Mr. Elliott's testimony is based on computation and busi-

ness records, which were not introduced into evidence, but which form the basis for his conclusion as to the amount of his lost earnings. By quoting at length from Mr. Elliott's testimony, we justify our failure, and avoid the necessity, of attempting to analyze it. We are of the opinion that the evidence as to loss in profits from the loss of use of Elliott's truck and trailer, rested on speculation and conjecture and a verdict of damages rendered thereon cannot stand.

Elliott's, Inc. has shown damage in the actual cost of repairs to its diesel tractor-trailer rig in the amount of $2,686.43. It is, therefore, entitled to judgment for that amount diminished by 15%, attributable to its own negligence. Elliott's, Inc. is entitled, therefore, to a net judgment in the amount of $2,283.47. The judgment rendered by the trial court was for $4,195.96, which amounts to $1,912.49 more than Elliot's, Inc. is entitled to under the evidence of record in this case. If Elliott's, Inc. wishes to remit the sum of $1,912.49 within 17 days, the judgment for the remaining $2,-283.47 will be affirmed, otherwise this case will be remanded to the St. Francis County Circuit Court for a new trial.

Affirmed on condition of remittitur.