Alan STALLINGS, et al. *v.* Earl POTEETE

CA 85-132 702 S.W.2d 831

Court of Appeals of Arkansas
Division I
Opinion delivered February 5, 1986

*Laws & Swain, P.A.*, by: *Ike Allen Laws, Jr.*; and *Owens, McHaney & Calhoun*, by: *John C. Calhoun, Jr.*, for appellants.

*Edmund M. Massey*, for appellee.

TOM GLAZE, Judge. Appellants appeal from the chancellor's order upholding a lease between appellee and Mary House, deceased. For reversal, appellants contend that the chancellor erred in (1) upholding the lease, (2) holding the renewal option valid, and (3) failing to hold that all hunting rights are held by the owner. We find no error and affirm.

On June 1, 1978, Mary House leased her farm to appellee for

$10,000 a year. The lease was to end on January 1, 1991, and could be renewed under the same terms and conditions. When the lease was executed, Miss House was ninety years old. Nine months following the execution of the lease, she was hospitalized and subsequently transferred to a nursing home, where she died in early 1981.

In her will, executed in 1975, House left her farm to appellants, and named Alan Stallings as executor. No copy of the 1978 lease to appellee was found among the decedent's effects and the appellants became aware of it only when appellee told them of its existence after House died. After consulting an attorney, appellants notified appellee that the lease was invalid. Appellee then filed an action against appellants to enjoin them from harassing him. Appellants counterclaimed for a declaration that the lease was invalid.

For their first point, appellants contend that the chancellor erred in upholding the lease because (1) House was not mentally competent to enter a valid lease, (2) the consideration and term of the lease made it unconscionable, and (3) the acknowledgement was defective. Concerning the mental competence and unconscionability issues, the parties presented mixed or conflicting testimonies. The record reflects that House and appellee had entered into leases in 1972 and 1974 which were identical to the 1978 lease, except for the term. Although the 1974 lease was for a six-year term, it was superseded by the 1978 lease, which covered not only the time remaining under the 1974 lease, but included an additional ten-year term. Appellants argue the appellee unduly influenced House by taking advantage of her failing mental state. To support their argument, they presented testimony that she was unable to care for herself or read without a magnifying glass and that she received no independent counsel before executing the 1978 lease. Appellee's witnesses testified that House had managed her farm for many years and was rational when the lease was executed. Significantly, Grace Farish, a long-time friend of House's, testified that House desired a long-term lease with appellee so she would be secure during her lifetime. Farish further stated that House trusted appellee and wanted him to remain as her tenant.

We find the evidence is similarly conflicting when consider-

ing appellants' argument that the lease was patently unconscionable because of the inadequate consideration appellee paid for it. Again, both sides presented witnesses who gave differing opinions concerning the fair rental value of House's farm. They considered such factors as estimated crop yield, crop prices, and soil content. Appellants' witnesses testified that a fair rental value would be in the range of $26,000. However, two of appellee's witnesses, who had farmed House's farm, stated that the actual crop yield was not as high as appellants' witnesses had estimated, and that the property was difficult to utilize because it was divided into several sections. They related they would pay no more than $10,000 to rent the farm. Appellee also testified that he was required to perform many more duties than in other, normal farming operations.

From the foregoing and other evidence, the chancellor found that House knew the extent of her property, entered into the 1978 lease on her own initiative, had an attorney prepare the lease, expressed satisfaction with its terms, and desired appellee to remain as her tenant. He also found she had reasons for wanting a long-term lease, and the consideration was adequate.

Appellants have cited us to several cases where instruments have been invalidated due to incapacity or undue influence. Those cases notwithstanding, the rule on appeal is that the findings of the chancellor will not be reversed unless clearly against a preponderance of the evidence. Since the question of a preponderance of the evidence turns largely on the credibility of the witnesses, we defer to the superior position of the chancellor. *Andres v. Andres*, 1 Ark. App. 75, 613 S.W.2d 404 (1981). In this case, the chancellor made his findings based on evidence which was oftentimes conflicting, and even though we might have reached a different conclusion, we cannot say he was clearly wrong in the result he reached.

Appellants further contend that the lease is invalid because the acknowledgement was made by telephone. In support of their contention, they cite Ark. Stat. Ann. § 49-208 (Repl. 1971), which provides that an acknowledgment of an instrument affecting real estate must be made by "the grantor appearing in person" before the proper official. Here, Marjorie Waller, the notary public who had acknowledged the 1972 and 1974 leases,

acknowledged the lease on June 2, 1978, upon receiving a telephone request from House. Waller testified that she knew House and recognized her voice on the telephone when House called to state she had signed the paper [lease]. These facts are similar to those in *Abernathy* v. *Harris*, 183 Ark. 22, 34 S.W.2d 765 (1931). There the court upheld a telephone acknowledgment of a mortgage when the notary testified he had known Harris for many years and was familiar with her voice. Here, as was true in *Abernathy*, the notary's certificate of acknowledgment is regular on its face, and absent any finding of fraud or forgery, we conclude the telephone acknowledgment is valid.

Next, appellants argue that the chancellor erred in holding the renewal option valid. The following language from the lease is pertinent:

> The term of this lease shall be from the first of June, 1978, to the first of January, 1991. The Tenant shall have the option of renewing this lease under the same terms and conditions as herein set out provided he shall notify the landlord in writing within three (3) months prior to the expiration of the lease term.

In the 1972 lease, the words, "for an additional four years," followed the word "lease" in the second sentence quoted above, but those words had been scratched through and initialed by both appellee and House. Those words were omitted from the 1974 and 1978 leases. Appellants contend that this omission invalidates the provision because the renewal term is undefined. Appellants also point to appellee's testimony that, although he and House never discussed it, appellee believed a new lease would have to be drawn up in order to renew.

Appellants cite *Lonoke Nursing Home* v. *Wayne and Neill Bennett Family Partnership*, 12 Ark. App. 282, 676 S.W.2d 461 (1984), wherein our Court stated the rule that an option in a written lease to renew upon terms and conditions to be agreed upon is void for uncertainty. In *Lonoke*, the lease provided that the terms, conditions, and rent would be agreed upon prior to the renewal date. In the instant case, no such lease provision exists. While appellants point to appellee's testimony concerning his belief that he did not believe he could renew the 1978 lease until another one was drawn up, appellee also explained that he never

recalled discussing the matter with House. In fact, as already noted, appellee and House omitted any mention in the lease that they must agree to the conditions and terms prior to a renewal lease.

■ Our supreme court has long held that a general covenant to renew is sufficiently certain because it imports a new lease like the old one upon the same terms and conditions. *Keating* v. *Michael*, 154 Ark. 267, 242 S.W. 563 (1922). Here, the term of the lease is provided in the same paragraph as the renewal option. Accordingly, we conclude that the chancellor, consistent with the *Keating* rule, was correct in holding the renewal lease valid for the same term specified in the 1978 lease.

Finally, appellants argue that the chancellor erred in failing to hold that appellants have exclusive control of hunting rights on the property. The chancellor ruled that appellants have the right to hunt on the property so long as they do not interfere with appellee's farming operation, and that hunting rights are vested in appellants, appellee, and their guests. Our research has failed to reveal any Arkansas case law or statute dealing with hunting rights under a lease. Appellants cite several cases from other jurisdictions which hold that hunting and fishing rights remain with the landlord, but each of these cases was decided under a statute giving the landlord these rights. As previously noted, Arkansas has no such statute.

■ In the absence of statutory authority, we must turn to the common law. *Lucas* v. *Handcock*, 266 Ark. 142, 583 S.W.2d 491 (1979). Arkansas has adopted the common law of England as of 1607. *See* Ark. Stat. Ann. § 1-101 (Repl. 1976). Appellants have cited us to *Copland* v. *Maxwell*, 2 L.R.-S. & D. App. 103, 8 Scot. L. Rep. 450 (1871), contending that all hunting rights are vested in the landlord without special reservation. However, that case was decided under Scottish law, not English law, and in *Copland*, the House of Lords noted that "[i]n England . . . the right of shooting is conveyed to the tenant by the lease unless it is excluded. . . ." 8 Scot. L. Rep. at 454. *See also Moore* v. *Lord Plymouth*, 7 Taunt. 614, 18 R.R. 604, 129 Eng. Rep. 245 (1817); A. Spencer, *Woodfall's Law of Landlord and Tenant*, at 883 (21st ed. 1924). Accordingly, we hold that the chancellor did not err in granting hunting rights to appellee. Since the issue of the

68

owners' hunting rights is not raised, we need not reach that issue.

Affirmed.

CORBIN and MAYFIELD, JJ., agree.