The Honorable Morril Harriman State Senator State Capitol Little Rock, AR 72201
HAND DELIVERED
Dear Senator Harriman:
You have asked for an official opinion concerning the following situation. Because the answers to your questions turn on the very specific facts of this case, we have set out at length the factors, as provided to us, that are the basis of your request.
According to information which you have submitted, the City of Van Buren owns a strip of land approximately 35 feet wide extending 214 feet along the side of the block upon which the Crawford County Courthouse stands. The County owns the rest of the block. Two principal structures occupy the block; namely, the Courthouse, located entirely on the county-owned portion, and a free standing two-story brick structure, which is on the city-owned portion. The entire block comprises a National Historic District; thus, it is subject to certain federal regulations. None of those federal regulations regarding historic areas would determine the answer to any of your questions to our knowledge. The two-story brick structure is the subject of a dispute between the City of Van Buren and Crawford County.
This latter building, built prior to 1900, was used as a jail until 1940. In 1940, the County built a new jail facility attached to the actual Courthouse. On March 15, 1940, the County and the City entered into two separate agreements — a lease and an accompanying agreement, as to the continued use of the two-story building. Those agreements are attached to this Opinion for your reference because our response relies on these two documents. By the terms of these documents, the County was to lease the two-story structure from the City for 99 years. As consideration, it was agreed that the City would be allowed to have city prisoners detained in the newly built jail at no cost. A separate provision appears in the agreement which would allow the City to enter into separate agreements with the County Sheriff for the feeding of City prisoners. You note that although there have been no such contracts reduced to writing, an apparent agreement was reached because the City has paid the County for the feeding of prisoners since at least 1979. Also, the agreement provides that the county can exercise no other control of the City prisoners other than keeping them in the jail.
The provisions of the Lease provide that it could be voided should some unforeseen thing, such as destruction of the County Jail by an Act of God or the public enemy, make the consideration for which this instrument was given, fail.
The County has begun to construct a new jail near the Courthouse which is scheduled for completion sometime this year. The County has announced its intent to treat the Lease as void, return the two-story structure to the City, and charge the City for the housing of City prisoners.
According to your correspondence, it is the position of the County that federal regulations and, presumably, constitutional requirements since 1940 concerning staffing, facility requirements, etc. for prisoners have changed so significantly that the agreement and Lease should be voided as unconscionable. Under that scenario, the County would then charge a fee to the City for the housing of its prisoners in the new facility. If, however, the County should be responsible for the housing of City prisoners, the County contends its only obligation would be to furnish cell space in the current jail facility, such obligation not extending to the staffing and feeding of prisoners.
On the other hand, the City contends that the agreement and Lease is still valid and that to charge for any prisoner care would be in violation of those documents. Also, the City argues that the County has waived any argument it has in this regard based upon the doctrine of laches. If the two-story structure is returned to the City, it argues that the County should restore it to its previous condition.
For easier reading, we set forth your individual questions and respond to them individually. Initially, as to the Lease and Agreement, under Arkansas law, a "contract" is an agreement which creates an obligation, having as its essentials competent parties, subject matter, legal consideration, mutuality of agreement and mutuality of obligation. Gentry v. Hanover Ins. Co.,284 F. Supp. 626 (W.D.Ark. 1968). We must assume, without being provided all of the facts which would allow determination of the above criteria, that all these criteria were met. The Lease and Agreement appear to create mutual obligations, have competent parties as signatories, and provide agreement between the City and the County. The consideration appears to be that in exchange for the leased property, the City could house its prisoners in the 1940 County facility.
 1. Is the contract and Lease in question still valid and enforceable?
The primary rule in construing a contract (including lease contracts) is to effectuate the mutual intent of the parties at the time the contract was made. Sydeman Bros. v. Whitlow, 186 Ark. 937,56 S.W.2d 1020 (1933). It is relevant to ascertain how the parties have performed under the contract in construing its terms. Steinberg v. King Baking Powder Co., 186 Ark. 1161, 1166, 57 S.W.2d 1057
(1933).
It is worthy of note that a review of Arkansas cases regarding construction of leases reveals each decision involves an analysis of a number of facts. Construction of leases or contracts is an area peculiarly dependent on fact construction.
With that in mind, it is my opinion that the answer to your first question is "yes". Here, the parties have entered into an agreement and lease for a term of 99 years, or until 2039. By its provisions, the terms of the lease will only become null and void "should some unforeseen thing such as destruction of the County Jail by an Act of God or the public enemy" occur, making the consideration for the lease fail. A lease will remain in effect during the term even if conditions have changed to such an extent so as to render operation of the lease inequitable. McMillan v. Malvern Gravel Co., 136 F. Supp. 567 (W.D.Ark. 1955). The Arkansas Supreme Court has stated that it is well settled that under leases containing provision for forfeiture and cessation of rent (or consideration) in event of destruction of the premises that an actual partial destruction will not terminate the lease though it renders the premises temporarily untenantable and does not relieve the tenant from future rent liability. Tedstrom v. Puddephatt, 99 Ark. 193, 200, 137 S.W. 816 (1911). And, "untenantability" does not include the normal wear and tear on leased premises. Tipps v. Mullis, 257 Ark. 622, 626, 519 S.W.2d 67
(1975). More recently, the Arkansas Court of Appeals has held that even though a parcel of property, the subject of a lease, was difficult to utilize and the crop yield was not as high as estimated, these factors did not make the operation of the lease "unconscionable". Stallings v. Poteete, 17 Ark. App. 62, 65,702 S.W.2d 831 (1986). Where one party to a lease does not perform its obligations thereunder or no consideration is agreed upon, a lease may fail. Eagle Properties, Inc. v. West Co. of La., Inc., 242 Ark. 184, 412 S.W.2d 605 (1967); Phipps v. Storey,269 Ark. 886, 601 S.W.2d 249 (1980). But, according to the facts you present, clearly, the initial requisites were present for entry into the Lease and an "unforeseen thing, such as destruction of the County Jail by an Act of God or the public enemy" has not intervened to prohibit the performance of the terms of this Lease.
In construing the phrase "unforeseen thing, such as . . .", we apply the principle of ejusdem generis; namely, that where general words are used in a contract [or lease] after specific terms, the general words are to be confined to things of the same kind or class as the things previously mentioned. Although the specific words follow the general here, we think the principle is applicable. In other words, it is presumed that the parties who entered into the Lease in 1940 intended that only catastrophes, devastating intervening factors would render the Lease null and void, and they used as examples of their agreement Acts of God or the public enemy.
Of course, whether or not constitutional and federal requirements regarding the housing of prisoners have so dramatically changed the circumstances that operation of the original Lease and Agreement would be unconscionable is ultimately a question of fact to be decided by a factfinder, i.e., as judge or jury. It is my opinion, however, that the outlined circumstances do not rise to the level which would allow non-performance by the County of the terms of the lease.
 2. Is the housing of City prisoners in the newest jail facility valid consideration for the Lease?
There must have been mutuality of obligation for entry into the 1945 lease. See, e.g., Lindner v. Mid-Continent Petroleum Corp.,221 Ark. 241, 252 S.W.2d 631 (1952). However, other jurisdictions have held that the consideration by one of the parties may be the performance of a future act. See, 51C C.J.S. Landlord and Tenant, 210. It is enough that the duty unconditionally undertaken by each party be regarded by the law as a sufficient consideration for the other's promise. Lindberg, at 244. Here, in exchange for the City's use, (then as well as in the future) of the new (1940) jail, it would lease land for that facility to the County. Reviewing the language of the Lease and Agreement at issue, it appears that such consideration was valid at the time of signing. But, whether or not the housing of City prisoners in the newest facility is valid consideration raises the question of whether there is mutuality of obligation between the parties. Therefore, currently many factual determinations have to be made to answer this question that this Office is not empowered nor enabled to make, and we cannot provide a definite response to your Question #2. However, the above is cited to provide some guidance in this determination.
 3. Is a fee charged by the County for housing City prisoners a breach of the contract and Lease?
The Lease and accompanying Agreement, by their express terms, provide for the "detention" of City prisoners in the County facility in exchange for a lease of the property on which the jail sits. It not contemplated that any fee will be charged for the housing or detention of City prisoners. Once again, there are many factors which would enter into a factfinder's consideration in determining whether or not the charging of a fee would be a material breach of the lease agreement. However, given the facts as presented to this Office, it is my opinion that in view of the express language of the lease, the charging of a fee could represent a material breach of the Lease by the addition of a new condition not contemplated at the time of the entry into agreement. See e.g., Arkansas Rice Growers Co-Op Ass'n. v. Archery Industries, Inc., 797 F.2d 565 (8th Cir. 1986).
 4. Is an abandonment of the leased property and an attempt to return it to the City a breach of the Lease?
In order to abandon the premises, there must be an intent to abandon and conduct by which the intention if carried into effect or such a relinquishment by the tenant as justified immediate resumption of possession by the landlord. Abandonment can occur by acts, word, or equivalent acts. See, Mizell v. Mercer, 165 Ark. 224,263 S.W. 398 (1924). Upon this relinquishment of possession, the property may be considered abandoned or surrendered. However, a landlord may refuse to accept the surrendered property — his acceptance of the surrender is necessary to concur in the end of the lease. Young v. Berman, 96 Ark. 78, 131, S.W. 62 (1910).
This, in response to your fourth question, if in fact the County has abandoned the leased premises, this conduct may indeed constitute a breach of the lease, unless the City accepts the abandonment, and a surrender has occurred.
 5. Is the County estopped by laches from arguing an unconscionable contract?
Laches represents neglect or omission to assert a right, taken in conjunction with a time lapse and circumstances which would operate as a bar to equitable relief for the party now attempting to assert that right. Your fifth question assumes that the County has known of the circumstances (which allegedly make the lease now impossible to perform) for some time and since it hasn't made these matters known to the other contracting party, (the City), until now, the County is estopped from arguing that it is unable to comply with the terms of the Lease. Whether or not laches is applicable is uniquely a question of fact for a factfinder to decide. See, La Vasque, et al. v. Beeson, et al., 162 Ark. 95,261, S.W. 49 (1924). This is so because only a factfinder can glean the necessary information to determine what the County knew or should have known about the alleged changed conditions and when.
 6. Is the County only responsible for furnishing some unstaffed cells in the present jail under the wording of the contract?
The response to this question would depend upon what was meant by the term "detention" of prisoners as used in the 1940 Lease and Agreement. The first analysis must entail what the original parties meant by use of the term "detention" when they entered into the Lease and Agreement. Bynum v. Seagram, 89 F. Supp. 780
(E.D.Ark. 1950). In modern parlance, "detention" means to hold one under arrest. It can be argued that because the parties entered into a separate agreement for the feeding of prisoners, that it was their intent that "detention" include items other than feeding, i.e, staffing of the jail facility which is necessary to "hold" one under arrest. Although this argument seems persuasive, again, this is an area in which a factfinder is uniquely qualified to determine what was meant by the use of a particular term in 1940.
 7. Can the City require the County to repair the structure before giving it back to the City?
In the absence of an explicit provision in the Lease to that effect, generally, the burden of repairing a structure falls upon the tenant, except for repairs necessitated by normal wear and tear on the property. Independent of that obligation, however, the County is obligated to return the premises to the City in substantially the same condition as when received, subject to the reasonable use to which the property has been put. See, generally, Basin Park Hotel Ass'n v. Arkansas Co., 160 Ark. 612,255 S.W. 302 (1923). This Office cannot determine whether the two story structure is in substantially the same condition as when the Lease was entered into, nor what the normal wear and tear of that facility has entailed for 49 years. However, the foregoing discussion is provided to be of guidance in determination of that question.
The foregoing opinion, which I hereby approve, was prepared by Solicitor General R.B. Friedlander.