**Billie Wayne WILKINS, Tressia Wilkins, and Wilkins Big Star # 177, Inc.**

v.

**M & H FINANCIAL, INC. and Malone and Hyde, Inc.**

**No. LR–C–78–406.**

United States District Court, E. D. Arkansas, W. D.

Aug. 30, 1979.

Robert J. Brown, Brown & Etter, P. A., Little Rock, Ark., for plaintiff.

Cyril Hollingsworth, Davidson, Plastiras, Horne, Hollingsworth & Arnold, Little Rock, Ark., John A. Stemmler and John R. McCarroll, Jr., Burch, Porter & Johnson, Memphis, Tenn., for defendant.

## MEMORANDUM OPINION

ROY, District Judge.

This action for a declaratory judgment and damages was filed by the plaintiffs, Billy Wayne Wilkins, Tressia Wilkins, his wife, and Wilkins Big Star # 177, Inc., an Arkansas corporation wholly owned by the other plaintiffs and hereinafter referred to simply as Wilkins. The complaint alleges that they executed a note payable to the defendant, M & H Financial, Inc., a Mississippi corporation, and that the note is usurious and void. M & H Financial answered, alleging the note is not void because it is governed by the law of Mississippi, the state of incorporation of M & H Financial.

It also stated a counterclaim for the balance of the note and foreclosure.

In an amendment to the complaint the plaintiffs alleged that M & H Financial is barred from equitable relief in Arkansas because it made the loan without being qualified to do business in Arkansas, a violation of the Wingo Act. Ark.Stat.Ann. § 64–1201 (Repl.1966). The complaint also stated claims against Malone & Hyde, Inc., a Tennessee corporation, that a sublease between plaintiffs and Malone & Hyde is usurious and void; that Malone & Hyde violated Arkansas and federal securities laws and anti-trust laws; and that it had dealt unfairly with the plaintiffs in several other respects which will be discussed later in this opinion.

During the trial the plaintiffs moved to amend the pleadings to conform to the proof. No objection having been made, the motion to amend is granted. The court deems waived any technical violations of the rules of procedure.

Billy Wayne Wilkins had worked in grocery stores from the time he was a teenager. When he was approached by Malone & Hyde, a wholesale grocer, Wilkins had an impressive background in grocery business management. However, he had never owned a store nor had a capital investment in one.

Malone & Hyde, a Tennessee corporation, began business in 1909 as a small commissary service for stores in the Delta. In 1947 it started a voluntary group for independent grocers. This enabled the independents to compete with chain stores by purchasing their groceries through one supplier, Malone & Hyde. The business grew and as it grew more services were offered to the grocers it dealt with, such as advertising and promotion groups, trade names, assistance in developing sites for grocery stores, and surveys of trade areas to determine expected profits. It provides insurance, purchases equipment for new stores and for remodeling existing stores; and is the parent corporation of the other defendant, M & H Financial, which lends money to customers of Malone & Hyde.

In 1975 Malone & Hyde began negotiations with Billy Wayne Wilkins concerning management and ownership of his own grocery under Malone & Hyde's "Big Star" trade name. Although nothing was put in writing at that time, Malone & Hyde offered all of its services. With the approval of Malone & Hyde, Wilkins selected a building site in North Little Rock. Malone & Hyde did a market survey, dated May 8, 1975, which indicated that the store should gross around $27,000 a week. After the survey was reviewed, the parties changed their plans to increase the size of the contemplated store from 8,000 square feet to 12,000 square feet.

Malone & Hyde leased the site on December 23, 1975. The lease provides for the landowner to erect a building to Malone & Hyde's specifications. On January 5, 1976 Malone & Hyde sublet to Wilkins, whose rental is stipulated as being 5% per month more than the Malone & Hyde rent. As the building neared completion, Malone & Hyde purchased the fixtures and equipment and had them installed. These were resold to Wilkins on an open account, charging a 5 to 11% markup. Malone & Hyde also stocked the store and advertised the grand opening. When Wilkins and Malone & Hyde discussed the capital financing of the store, Wilkins was told that he could either arrange his own loan or that Malone & Hyde would make arrangements for a loan through its subsidiary, M & H Financial. Wilkins went to his local Arkansas banker but the bank would not loan him the money and according to his own testimony he was unable to secure a loan in Arkansas. Wilkins then decided to finance through M & H Financial which agreed to loan the money for an interest rate of 10% simple interest or 3% over the prime rate of the Bank of New York, whichever is greater.

The loan application, executed on May 11, 1976, states, *inter alia*:

A. Loan can be made only to a Corporation, the charter of which was issued at least 60 days prior to date of the note.
B. On new store and major remodels, payments will begin thirty days after opening of store. Interest will begin immediately upon store's opening.
C. Payments to be collected on recap following first of each month.

The loan application was for $265,000. However, both parties knew that this amount was only an estimate; that the final loan amount would not be known until all the equipment and inventory was purchased and installed. The last item of equipment was invoiced on July 23, 1976. The total bill was dated August 5, 1976 and received by Wilkins on August 11, 1976.

The grand opening was held on June 15, 1976, and was advertised as planned, except that there was no television advertising. The incorporation papers, drafted by Wilkins' attorney, bear the same date. The opening was a disappointment. The store took in approximately $14,000 the first week and has never been as profitable as expected.

The documents evidencing the indebtedness of the Wilkins to M & H Financial were signed on September 7, 1976, nearly three months after the store opened and was incorporated. On September 7th the Wilkins drove to Malone & Hyde offices in Memphis, Tennessee and met with officers of Malone & Hyde, who were also officers of M & H Financial. After the Wilkins gave a $3,000 check to Malone & Hyde, they were driven in a Malone & Hyde automobile to the M & H Financial office in Southaven, Mississippi, which borders Memphis. There they signed six documents. One of these is a Settlement Sheet showing the total loan balance as $306,760.86. Loan disbursements are listed on that document under several classifications, but the summary is that the entire loan amount was to liquidate the account with Malone & Hyde, except for $783 closing costs to M & H Financial.

As time passed the store continued to suffer from lack of business. The Wilkins went deeper in debt. They borrowed from family members and refinanced their home. On March 9, 1977 it became necessary for plaintiffs to have the September 7, 1976 note refinanced. The amount of the note was increased to a total of $320,000.00 and

plaintiffs were paying only the interest each month. Nevertheless, plaintiffs' financial condition continued to deteriorate and several checks to defendants bounced, so Malone & Hyde refused to continue to give them credit for groceries. The Wilkins then found other suppliers who were willing to carry their accounts and at the time of trial they were in debt to these suppliers for many thousands of dollars.

At this time, Wilkins consulted his local banker about his financial problems and discussed the loan with M & H Financial, and he was advised by the banker that if the loan were governed by Arkansas law, the interest rate was usurious. The Wilkins then filed this lawsuit asking for a declaratory judgment that the loan is void.

As the case developed, Wilkins' attorney learned that the interest charged on the account with Malone & Hyde was calculated for the term June 15 to September 30. Because the date of the note is September 7, plaintiffs contend that they were overcharged, that Malone & Hyde was not entitled to interest after the M & H Financial note was signed and the account was paid. Therefore, the court must examine the entire transaction to determine if it is usurious.

The Settlement Sheet shows loan expenses totaling $9,730.19. $783 of this amount was for closing fees, filing fees and title search. These are proper charges made by M & H Financial and are not hidden interest. The remainder, $8,947.19, was for finance charges on the account with Malone & Hyde. It is indicated on the bottom of the Settlement Sheet that the loan expenses were paid that day in cash; however, it was understood that the Wilkins did not have sufficient cash to pay all of this amount on that day. The check for $3,000 given to Malone & Hyde earlier that day took care of only part of it. Payments made to Malone & Hyde in September and October liquidated the balance due. No additional interest was charged.

The amount of interest due on the Malone & Hyde account was computed by the M & H Financial accountant. He selected the dates of June 15, 1976 to September 30, 1976 and figured 10% interest on the balance of $306,760.86 for that period of time. He stated that he did this so that Wilkins would pay a finance charge on the Malone & Hyde account to September 30 and the interest would begin on the promissory note on October 1. The first payment on the note was due on November 1. He also testified that to calculate the interest he merely used an average of three and one-half months on each of the items of the principal to be financed: "Just to make it simple, I used the time it opened until September 30th."

If we do not view the entire picture it might appear that the interest charged was in excess of 10%, but viewing all the transactions together, as we must, there is no evidence that the plaintiffs paid more than 10% interest over the continuum.

■ Where the face of the instrument provides for a lawful interest rate, usury will not be presumed, imputed to the parties, or inferred if the opposite result can be fairly and reasonably reached. The transaction must be viewed as of the time it was made in the light of all the attendant circumstances. *McCoy Farms Inc. v. J. & M. McKee,* 263 Ark. 20, 563 S.W.2d 409 (1978); *Hayes v. First National Bank of Memphis,* 256 Ark. 328, 507 S.W.2d 701 (1974).

■ On the loan application the Wilkins agreed to pay interest from the date the store opened, which was June 15, 1976. The rate of interest is stated as 10% simple interest or 3% above Bank of New York prime rate, whichever is greater, but the rate is stated in reference to the contemplated note. The Settlement Sheet does not state the rate of interest charged on the Malone & Hyde account but the court finds that the $8,947.19 charged is not more than 10% for the period from June 15 to September 30, and interest on the open account was not excused.

The execution of the note was delayed apparently, for various reasons. It was agreed that the Wilkins would have two weeks to build their inventory and the bill

for this was to be included in the principal amount of the note. Also, the business was not incorporated until the opening date and a condition stated in the application was that the loan be made only after the corporation had been formed for 60 days. The delay, therefore, was for the convenience and protection of both parties.

As stated above, it was understood that the Wilkins did not have sufficient cash to pay all of the interest charges on the day the note was signed. There is no testimony that they would have been required to pay the entire amount that day even if they could have. The date the note was signed is no more important in this case than it is in cases where the note is antedated to take care of interest that accrued prior to the time the document was executed. See *McCoy Farms Inc. v. J. & M. McKee, supra.* The important facts in this case are that the plaintiffs opened the store on June 15, 1976, but paid no money to either defendant until September 7, 1976, and then only $3,000. No payment was made on the principal of the debt until November 1, 1976. The plaintiffs have presented the court with no figures demonstrating that the payments made in September and October were of such amount that the principal should have been diminished, thereby making the interest greater than 10%. Accordingly, the court finds that there was no illegal exaction pertaining to the Malone & Hyde account.

Even if the transactions are viewed separately, the interest charges that could have been taxed from the time the various items of merchandise were delivered was more than the amount that was actually charged. The M & H Financial accountant testified that he recalculated the interest computing 10% interest for each item sold to the Wilkins from the date received by them to September 7, 1976. (Crediting 10% interest to the Wilkins for a $10,000 down payment from the date it was received by Malone & Hyde, July 14, 1976.) Using these dates, the total interest allowable was $9,033.44. This amount is more than the $8,947.19 actually charged.

The Wilkins had a possessory interest in the store building from the date the lease was signed, January 5, 1976, insofar as installation of the fixtures and inventory is concerned. This is because the sublease, which incorporates the terms of the lease, states "SUB TENANT herein being considered as if TENANT in said lease . ." and the lease provides that the tenant may install fixtures.

The plaintiffs have presented no evidence that the understanding of the parties was that there be no interest until June 15, the date the store opened, or that the interest prior to that date be forgiven as was the case in *White v. Friedlander,* 35 Ark. 52 (1897). The burden of proving usury is upon the party who asserts it. *Poole v. Bates-Pearson Auto Sales,* 257 Ark. 764, 520 S.W.2d 273 (1975). It will not be presumed, imputed to the parties, or inferred if the opposite result can be fairly and reasonably reached. *McCoy Farms, Inc. v. J. & M. McKee, supra.*

The plaintiffs also claim that the percentage markup on the sale of the merchandise should be characterized as interest, thereby tainting the transaction with usury. The sale of goods for a profit of more than 10% is not usury. *Starling v. Hamner,* 185 Ark. 930, 50 S.W.2d 612 (1932); *Blake Bros. v. Askew & Brummett,* 112 Ark. 514, 166 S.W. 965 (1914). The plaintiffs claim that the total profit, when added to the interest rate, brings the total to more than 10%. There is absolutely no evidence that the transfer of the goods from Malone & Hyde to the Wilkins was anything other than a bona fide sale. The fact that Wilkins shopped for some of the materials and placed some orders himself does not make it any the less a sale. The court finds that these transactions were valid sales and not a cloak for usury. See *Hare v. General Contract Purchase Corp.,* 220 Ark. 601, 249 S.W.2d 973 (1952).

Therefore, the initial transaction between Wilkins and Malone & Hyde was not usurious and could not taint the subsequent transaction between Wilkins and M & H Financial, even if the second could be char-

acterized as a renewal note under the rule of *Hallan v. American Bank of Commerce & Trust Co.,* 159 Ark. 141, 252 S.W. 359 (1923). It is not necessary that the court decide that issue.

The validity of the lease is also questioned because the Wilkins pay a 5% per month markup on their rent over and above that which Malone & Hyde pays the owner. The facts in this case do not even imply that the sublease is a loan or forbearance disguised as a sublease. The cases where a lease has been held to be a cloak for usury usually involve a sale to the lender and a lease back by the seller or a purchase disguised as a lease. There was no sale of the store property. The lease makes no mention of the transfer of title to this property, nor does any other document or testimony in evidence. The court finds that this sublease is not a loan and does not involve usury.

The Wilkins claim that the lease and the purchase of merchandise for resale to Wilkins amount to a loan of credit and are therefore usurious. The court finds that there was neither a loan nor sale of credit nor was there a usurious transaction. These were nothing more than bona fide sales and sublease.

The Wilkins also claim that the note to M & H Financial, which bears an interest rate in excess of 10%, is usurious because it is governed by the laws of Arkansas and not Mississippi, where it was executed.

Malone & Hyde was actively involved in the planning and execution of the opening of the Wilkins' store. M & H Financial was the lender. Although it is not disputed that M & H Financial is wholly owned by a Tennessee corporation, which in turn is wholly owned by Malone & Hyde, there was no evidence that M & H Financial is not a wholly separate and distinct, lawfully incorporated creature of the State of Mississippi—governed by the laws of Mississippi and entitled to the protection of the laws of that state. The plaintiffs did not succeed in piercing the corporate veil between these two entities. Therefore, we must determine whether the transaction in issue is governed by Mississippi law.

Because the loan of money from M & H Financial to the Wilkins involved a negotiable instrument, the Uniform Commercial Code, as enacted in Arkansas, provides generally the applicable statutory framework. Ark.Stat.Ann. § 85–1–101, et seq. (Repl. 1961). Section 85–1–105 gives the parties to a transaction the power to select the forum whose laws are to be applied, provided the transaction bears a reasonable relation to that state. But this section does not govern usury questions which are specifically excepted from the Code by § 85–9–201. *Cooper v. Cherokee Village Development Co.,* 236 Ark. 37, 364 S.W.2d 158 (1963); *Lyles v. Union Planters National Bank,* 239 Ark. 738, 393 S.W.2d 867 (1965). Therefore, the court must consider the conflicts law of Arkansas relating to the usury question, as it has developed in case law both before and after the U.C.C. was enacted.

Plaintiffs argue that because the loan was solicited in Arkansas, is secured by property located in Arkansas (by property sold by the parent corporation), Arkansas sales tax was paid on the property, the loan application was executed in Arkansas and the payments were collected in Arkansas by Malone & Hyde employees acting as agent for M & H Financial, that it is an Arkansas contract to be governed by the laws of Arkansas.

The Wilkins' argument is, essentially, that the "center of gravity" theory should dictate the decision in this case. In *Cooper v. Cherokee Village Development Co., supra,* the Arkansas Supreme Court declined to adopt the center of gravity theory for a usury case. That opinion approved the three traditional theories that had previously been accepted as controlling—the place of making, *Smith v. Brokaw,* 174 Ark. 609, 297 S.W. 1031 (1927); the place of performance, *American Farm Mortgage Co. v. Ingraham,* 174 Ark. 578, 297 S.W. 1039 (1927); and the intent of the parties, as expressed in the documents, *McDougall v. Hachmeister,* 184 Ark. 28, 41 S.W.2d 1088 (1931). To understand the position the Arkansas court

has recently taken it is well to consider first the policies behind the development of new theories of choice of law in contracts cases.

Traditionally the preferred theory was that the place of making the contract determined the applicable law. Restatement, Conflict of Laws, § 332 (1934). The underlying policy reason was that this forum had the greatest certainty. The place the contract was made was definite and singular and the place where the contract was made gives existence to the contract. As technology developed, the certainty of the place of making was partially destroyed. Contracts are now made by mail, telephone, telegraph, and in flying machines. The "idea that a contract has a particular nationality appears absurd in cases where the place of making is fortuitous and completely inconsequential to the transaction itself." Levin, *Party Autonomy: Choice-of-Law Clauses in Commercial Contracts*, 46 Geo.L.J. 260, at 267 (1957–58).

*Standard Leasing Corp. v. Schmidt Aviation*, 264 Ark. 851, 576 S.W.2d 181 (1979), is the most recent Arkansas usury case involving a conflicts issue. It is cited as authority for using the "center of gravity" approach to this contract. The central point of discussion in the opinion involved a determination that an instrument that appeared to be a lease was in fact a contract for a credit sale of merchandise. The last paragraph of the opinion contains a ruling that the contract is governed by the law of Arkansas *despite the fact the instrument recites that it is the intent of the parties that it be governed by the law of Tennessee.* The reason given for this holding is that the principal significant contacts occurred in Arkansas. The contacts referred to include: The seller sent its representatives to Arkansas where the actual sale occurred; the Arkansas sales tax was paid; the air compressor was delivered and installed by the seller in Arkansas; and the original written contract was prepared and signed

by the buyer in Arkansas and was finally consummated in Arkansas.

The Tennessee contacts were that it was the residence of the lender and it was, perhaps, the place of payment. The contract was so written that but for a mistake it would have been consummated in Tennessee. But the opinion stated that the fact the contract was made in Arkansas was merely fortuitous and not controlling. In noting that the place the contract was consummated was fortuitous, the opinion implies that the decision would have been the same even if the place of contracting had been Tennessee.

Thus, it might be argued that *Cherokee Village* was overruled by the *Standard Leasing* case; however, we do not think this is a correct conclusion upon careful analysis of the cases.

The authority cited in the *Standard Leasing* opinion is Leflar, American Conflicts Law, § 147 (1968). In this section of his treatise Dr. Leflar discussed the "center of gravity" approach. He noted that "[t]here is a real danger that a court will engage in a process of counting contacts, rather than evaluating them qualitatively." *Id.* at 366. The Arkansas court was not guilty of this abuse in the *Standard Leasing* case. The significance of that decision is the requirement (at least where the sale of goods is concerned) that the place of making or the place of performance be *significant* and not merely fortuitous or the result of a skillful use of contract language and the United States Mail.

The *Standard Leasing* opinion cannot be read to limit the right of an individual to exercise business judgment in borrowing money at more than 10% when the parties involved take deliberate, effective, and bona fide steps to take the transaction outside the scope of Arkansas law as was done by Mr. Wilkins. This would be in conflict with the holding in *Cherokee Village.*[1]

---

1. The court also has doubts concerning the constitutionality of interpreting the Arkansas usury statute in such a way that loan contracts executed in other states and valid there are declared illegal under Arkansas law. This would seem to be an unreasonable application of the Arkansas law, where, as here, the agreements were made in the foreign state voluntarily and knowingly by intelligent and mature

In *U. S. Manganese Corporation v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 576 F.2d 153 (8th Cir. 1978) the appellants sought relief from appellee on the ground that certain agreements entered into by the parties were usurious. The parties filed cross motions for summary judgment on the issue of whether the loan agreements between the parties were governed by New York law or Arkansas law.

After a hearing on the motions, the trial court, applying Arkansas law, determined (1) that the parties had agreed that the law of New York would be the applicable law, and (2) that there was a reasonable relationship between the transactions and the State of New York. 576 F.2d at 155.

The Eighth Circuit Court of Appeals affirmed the district court stating:

The Supreme Court of Arkansas has indicated that provisions of the Uniform Commercial Code, Ark.Stat.Ann. § 85–1–101 et seq. (1961 Addendum and 1975 Supp.), do not affect Arkansas law on usury . . . However, there is little difference, if any, between the Uniform Commercial Code provision, Ark.Stat. Ann. § 85–1–105(1) (1975 Supp.), and Arkansas case law on usury regarding the test for determining when parties may agree that another state's law will govern an agreement. Section 85–1–105(1) requires a "reasonable relation" between the transaction and the state whose law is chosen to govern. The cases applying Arkansas usury law have stated the test similarly. E. g., *Lyles v. Union Planters National Bank of Memphis, supra,* 393 S.W.2d at 868–69 (agreement and "reasonable and bona fide basis for the parties so agreeing" required); *Cooper v. Cherokee Village Development Co., supra,* 364 S.W.2d at 158 (agreement and "substantial connection" between the other state and the contract required); *National Surety Corp. v. Inland Properties, Inc.,* 286 F.Supp. 173, 190 (E.D.Ark.1968),

aff'd, 416 F.2d 457 (8th Cir. 1969) (agreement and "reasonable relationship" between the chosen body of law and the contract required).

576 F.2d at 157.

We have similar facts in the case at bar, definite agreement of the parties and a reasonable relationship between the transactions and the State of Mississippi.

Because the intent of the parties will not be honored unless one or more of the other criteria are met the court must look first to the place of making the contract.

Even under the more restrictive rule, the note in question is valid. The contacts with Mississippi were significant and were not merely fortuitous. The parties went to some inconvenience to sign the papers in Mississippi. The place the papers were signed was not inconsequential. Only in Mississippi could the Wilkins obtain the financing they needed to open their store. After they were denied the desired financing in Arkansas, they actively sought to obtain the loan in the foreign jurisdiction. Pursuant to the negotiations they incorporated the store and agreed to put the stock certificates in the possession of M & H Financial in Mississippi.

Because the contract had a substantial connection with Mississippi, the parties had the right to agree that the laws of that jurisdiction would govern the transaction.[2] *Cooper v. Cherokee Village Development Co., supra.* The reference to Mississippi in the documents signed on September 7 are summarized as follows:

NOTE, showing $306,760.86 as the principal amount, first payment due November 1, 1976 at M & H Financial, Inc., Southaven, Mississippi, or such other place designated by M & H Financial. Interest is stated at 10% or 3% over the prime rate of the New York City Bank, whichever is the greater. It also includes a statement that the interest will not be more than the maximum

---

businessmen with complete disclosure of the amount of interest to be charged.

2. The Mississippi law provides that an interest rate in excess of 15% is illegal. Mississippi Code Annotated § 75–17–1. There was, of course, no violation of Mississippi law.

legal rate allowed by the laws of the State of Mississippi.

COLLATERAL SECURITY AGREEMENT, wherein the Wilkins agreed to endorse the note and pledge their corporate stock in Wilkins Big Star # 177, Inc., give M & H Financial a security interest in the stock for repayment of the loan, and that M & H Financial shall hold the pledged shares as security. The documents each state that in the event of default, "M & H Financial, Inc. shall have the rights and remedies provided in the Uniform Commercial Code in force in the State of Mississippi at the date of this agreement." It further provides that on five days notice M & H Financial may sell all the pledged shares of stock.

The provisions in the note and collateral security agreements sufficiently state the intent of the parties that the law of Mississippi governs the transaction. Considering the provisions that the payments be made in Southaven, Mississippi; the fact that the papers were executed in Mississippi; the reference to the maximum legal rate in Mississippi; and the requirement that the Wilkins pledge their stock to M & H Financial and allow it to hold the shares as security, it is clear that the intent of the parties was that the note be governed by the laws of Mississippi. See, *Yarbrough v. Prentice Lee Tractor Co.,* 252 Ark. 349, 479 S.W.2d 549 (1972); *American Farm Mortgage Co. v. Ingraham, supra.* The testimony also supports this conclusion.

The record reflects that the Wilkins never contemplated that the loan from M & H Financial would be an Arkansas transaction or be governed by an Arkansas interest rate. Wilkins' testimony on this point as given throughout the trial is unequivocal. Upon direct examination by his counsel at the preliminary hearing, Mr. Wilkins testified that he was told his borrowing rate would be off of New York prime plus three and the loan application was made with that knowledge.

At the hearing on the merits Wilkins replied in response to a question by the court that when he was talking with a Malone & Hyde officer in 1975 he was told

that he could borrow the money in Arkansas at an Arkansas bank, but that if he wanted to go through their finance company, the interest rate was New York money plus three.

THE COURT: They advised you before you signed any of these papers or anything what the rate was going to be?

MR. WILKINS: New York money plus three, yes, ma'am.

A Malone & Hyde officer testified that the interest rate was discussed with Mr. Wilkins and he did not complain about it, but seemed appreciative that he was going to get the loan.

A witness for the defendants testified that they do not "hawk" M & H Financial loans. There is no evidence that any inducement was offered to the Wilkins to borrow the money from M & H Financial, or that they were misled in any way as to the interest rate to be charged. The court finds that the decision to borrow the money in Mississippi was entirely voluntary on the part of the Wilkins.

Finally, when Mr. Wilkins was called in rebuttal under examination by his counsel he testified that he attempted to borrow the money in Arkansas but could not.

Much of the plaintiffs' evidence involved the fact that the monthly payments were collected by agreement with Malone & Hyde as a part of its weekly statement for groceries and other expenses. The collections were made pursuant to a collection agreement with Malone & Hyde that the Wilkins signed while they were at the Memphis office on September 7. This agreement provides that the Wilkins pay to Malone & Hyde on the weekly statement an amount sufficient for Malone & Hyde to remit to the lender the amount of amortized principal and interest due and payable on the note. This figure was determined to be $1,293.25. These weekly payments were collected by Malone & Hyde in advance of the due date of the monthly payments to M & H Financial. No interest was credited for this money while it was in the hands of Malone & Hyde and before it was transmitted to M & H Financial.

The court finds that this method of payment was voluntary and for the convenience of both the debtor and the lender. Vast sums of money are transferred in and out of grocery stores each week. Payments for supplies are made weekly. It would be a burden on the grocer to make a large monthly payment, whereas a weekly payment of a lesser sum would be easier to manage. Such was the testimony by the defendants' witnesses and the court finds that the collection agreement was a voluntary one that was made without coercion.

The fact that Malone & Hyde employees, by agreement, collected the payments in Arkansas does not make Arkansas the place of payment. The note specifically provides that payments are to be made in Mississippi and at all times M & H Financial had a right to insist on compliance with this term of the note. See *American Farm Mortgage Co. v. Ingraham, supra; Seeman v. Philadelphia Warehouse Co.*, 274 U.S. 403, 47 S.Ct. 626, 71 L.Ed. 1123 (1927).

No authority has been cited that these prepayments would make the note usurious and void under the law of Mississippi. The Arkansas rule is that voluntary payments made before they are due does not result in usury. *Eldred v. Hart*, 87 Ark. 534, 113 S.W. 213 (1908). This case does not involve the type of involuntary prepayment that was condemned in *Green v. Mid-State Homes*, 245 Ark. 866, 435 S.W.2d 436 (1968). The lender did not hold back part of the loan under the guise of an acceptance of voluntary prepayments. The prepayments were not made by a borrower acting under the pressure of financial necessity.

■ The defendant, M & H Financial, is not barred from enforcing the note in Arkansas. The Wingo Act, Ark.Stat.Ann. § 64–1202 (Repl.1966), provides that a foreign corporation which fails to file its articles of incorporation "cannot make any contract in the State which can be enforced by it either in law or in equity  .  .  .."

This penalty applies only to contracts made in the state and is strictly construed in favor of those against whom the penalty is sought. *Widmer v. J. I. Case Credit Corp.*, 243 Ark. 149, 419 S.W.2d 617 (1967); *Brown Broadcast, Inc. v. Pepper Sound Studios, Inc.*, 242 Ark. 701, 416 S.W.2d 284 (1967); *United Press International, Inc. v. Hernreich*, 241 Ark. 36, 406 S.W.2d 317 (1966). The note was not executed in the State of Arkansas. Therefore, M & H Financial is entitled to enforce it in this state.

■ The allegation that the transactions involved the sale of an unregistered security in violation of Arkansas and federal law is also without foundation. The Arkansas statutory definition of a security is similar to that found in the United States Code. Ark.Stat.Ann. § 67–1247(*1*) (Repl.1966); 15 U.S.C. §§ 77b(1), 78c(a)(10). These laws govern a wide variety of transactions. Most of these involve a passive contribution of risk capital. *Schultz v. Rector-Phillips-Morse, Inc.*, 261 Ark. 769, 552 S.W.2d 4 (1977). Some, however, involve some contribution of effort by the investor. *S.E.C. v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir. 1973). The Wilkins made no investment in Malone & Hyde. Their investment was in their own enterprise over which they had virtually an exclusive right of control. Therefore, there was no sale of a security. *Fargo Partners v. Dain Corp.*, 540 F.2d 912 (8th Cir. 1976); *Schultz v. Rector-Phillips-Morse, Inc., supra.*

■ In addition to plaintiffs' allegations which have already been discussed in this opinion, plaintiffs claim damages because of defendants' fraudulent and negligent misrepresentations. The primary contention of Mr. Wilkins is that the local market survey prepared by Malone & Hyde was clearly erroneous since it failed to take into consideration the impact of the commissary at the Little Rock Air Force Base on this particular market area. This resulted in gross sales being less than forecast. The defendants do not deny that an error was made, but they do deprecate the importance which plaintiffs have placed upon this error, and contend that since Mr. Wilkins has lived in North Little Rock all his life and in the area where the new store was opened for six years, he either was aware or should have

been aware that prospective customers made purchases from the commissary. The defendants contend further that being knowledgeable of this area, he must bear joint responsibility for this oversight.

The court finds merit in defendants' position and that the testimony reflects selection of the site for the store was a joint project of Mr. Wilkins and Malone & Hyde, and that both parties are to blame for not taking into consideration the military personnel who might be living in the area surrounding the store when the survey was made. The decision to expand the store on the basis of the survey was a joint decision also.

Plaintiffs contend further on this issue that the statement of Malone & Hyde's representative, Frank Sherman, that Wilkins or anyone could gross $27,000 in sales per week constitutes actionable misrepresentation. Mr. Wilkins also contends that because of defendants' actions he is entitled to recover damages "well in excess of $200,-000".

As to Mr. Sherman's representation, the court finds that it was in the nature of an opinion and not a guarantee made by the defendants. There can be no recovery when the statement relied on is an opinion rather than a statement of fact. *Anthony v. First National Bank of Magnolia*, 244 Ark. 1015, 431 S.W.2d 267 (1968).

■ Although the plaintiffs vigorously contend that they are entitled to damages for lost profits due to the error in the survey, they have produced no figures from which to determine expected net profits. However, it is not necessary for the court to determine whether lost profits or any other damages should be awarded in this case because they have not been proved. Damages must be proved with reasonable certainty and may not be conjectural nor rest on individual opinions of the parties or the witnesses. *Traylor v. Huntsman & Allis Chalmers*, 253 Ark. 704, 488 S.W.2d 30 (1972); *Eagle Properties v. West & Co.*. 242 Ark. 184, 412 S.W.2d 605 (1967).

Plaintiffs did prove substantial losses incurred in operating the business and figures pertaining to gross revenues were presented. It is evident though that profits may not be measured by the difference between expected gross revenues and actual gross revenues without taking many other factors pertinent to the operation of a store into consideration. No evidence was introduced as to these factors.

Neither have the plaintiffs attempted to prove their damages by showing the difference between the market value of the store, assuming the survey had been correct, as compared with its present market value.

Defendants urge and have presented evidence to support their theory that the financial difficulties of the store were caused by Mr. Wilkins' failure to manage the store in a businesslike and efficient manner. As an indication of Mr. Wilkins' weakness in this area they point to the fact that Mr. Wilkins received an initial loan of $306,-760.80 from M & H Financial, followed by additional refinancing which brought the loan to $320,000.00. Besides this sum, Mr. Wilkins testified that he put $10,000 of his own money in the store and borrowed from other persons another $80,000. He also testified at trial that he owed another supplier of groceries some $60,000 to $70,000. During this same period of time when his indebtedness was rapidly increasing, Mr. Wilkins purchased a new Mark V automobile which cost $12,900, a new truck for his store costing $8,000, and took trips to Rio de Janeiro and Hawaii which cost approximately $1,500 apiece. He also testified that last summer he and his wife invested $3,000 in a miniature golf course. Although there was no indication that the personal expenditures came from the store, it does reflect that Mr. Wilkins was not trying to economize or repay his lenders as he continued to borrow more and more money. The court does not find that the erroneous survey was the proximate cause of Mr. Wilkins damages.

■ The court finds the testimony of defendants' witnesses credible as to sums due from the plaintiffs on the various

accounts and that the figures which the defendants' witnesses presented in court were accurate, and that M & H Financial, Inc. is entitled to recover on the promissory note executed by the Wilkins and also to recover the money which has been paid into an escrow account pursuant to the court's order. Malone & Hyde, Inc. is entitled to recover the money owed it by Wilkins Big Star # 177, Inc. and also to recover from Wilkins personally the money owed for rent.

Plaintiffs have made other allegations[3] which are interwoven with the main issues which the court has discussed in this opinion. The court finds that these related issues have no merit. Since all issues of fact have been decided in defendants' favor, the attorney for the defendants is directed to prepare a proposed precedent for judgment showing the sums owed by plaintiffs to defendants to date. This proposed precedent for judgment should be mailed to the court within five days, with a copy being mailed to plaintiffs' attorney who will then have five days thereafter to file objections, if any, thereto. On due consideration of the proposed precedent and any objections, an appropriate judgment will be entered by the court.

---

**3.** These included the contention that defendants did not comply with the agreement concerning advertising, but we find that defendants in fact expended large sums, even beyond that required by the agreement, to advertise and promote Wilkins Big Star # 177, Inc.