**BICE CONSTRUCTION COMPANY, INC., Appellant,**

v.

**CIT CORPORATION OF THE SOUTH, INC., Appellee.**

Civ. A. No. LR–C–80–585.
Bankruptcy No. LR–80–259.

United States District Court,
E.D. Arkansas, W.D.

April 8, 1982.

James M. Hollis, Charles Darwin Davidson, P.A., Little Rock, Ark., for appellant.

David M. Powell, Wright, Lindsey & Jennings, Little Rock, Ark., for appellee.

## ORDER

EISELE, Chief Judge.

This is an appeal from a judgment of the Bankruptcy Court rendered on December 2, 1980. The sole issue before this Court is whether or not the Bankruptcy Court was correct in dismissing the counterclaim of the appellant, Bice Construction Company, Inc., alleging usury under Arkansas law. For the reasons set forth below, the judgment of the Bankruptcy Court is affirmed.

The litigation arose from a direct loan security agreement entered into between Bice Construction and CIT Corporation of the South, Inc. Bice Construction is an Arkansas corporation engaged in the build-ing industry. CIT Corporation is a Delaware corporation, with its headquarters and principal place of business in Atlanta, Georgia. CIT Corporation is authorized to do business in Arkansas.

The facts of the case are not disputed. On February 27, 1979, Bice Construction contracted with CIT Corporation for a loan to purchase certain equipment for its business. CIT Corporation took a security interest in the equipment Bice purchased and properly perfected that interest. When CIT Corporation sought permission from the Bankruptcy Court to foreclose its security interest, Bice responded that the interest rates on the contracts were usurious.

The loan transaction in issue occurred, for the most part, in Arkansas and Tennessee. The financing agreement was solicited by Andy Rose, the district sales manager with the Memphis Division of CIT Corporation of the South (a divisional office of CIT Corporation of the South). The solicitation took place in Arkansas, the home of both Mr. Rose and Bice Construction. The necessary credit investigations were made in Memphis where a decision was formulated as to Bice's credit-worthiness. The loan documents were prepared in Memphis; notification of the acceptance of the contract came from Memphis; and the loan funds were disbursed from Memphis. The contract, itself, was executed by Bice in Arkansas. Additionally, payments were both mailed and received by Bice in Arkansas. Finally, the financing statements were signed by Bice in Arkansas and by a CIT representative in Memphis prior to their being filed with the appropriate filing office in Arkansas.

The transaction, however, also had certain contacts with Georgia. The security agreement provides that the "instrument shall not become effective and binding on Secured Party (CIT) until accepted by Secured Party in Atlanta, Georgia." Pursuant to this language, the contract was, in fact, executed by a CIT official in Atlanta. As was CIT's uniform practice, no monies were disbursed until the documents were signed by the CIT official in Atlanta and

the Memphis office was so notified. Additionally, the payments were to be made to CIT's headquarters in Atlanta. Finally, the instruments provide that it is "the intention of the parties that [the instruments] shall be interpreted and the rights and obligations of the parties hereunder shall be governed by the law of the state of Georgia."

It is undisputed that the loan agreement in issue included an interest rate in excess of ten percent (10%) per annum. Thus, if Arkansas law is applicable, there is no question that the note and security agreement executed in favor of CIT Corporation were usurious and void both as to principal and interest. Ark. Const. art. 19 § 13; Ark. Stat.Ann. §§ 68–602, 68–604, 68–608, and 68–609, *et seq.* On the other hand, it is clear that the note and security agreement would not be considered usurious under the law of Georgia. The question before the Court, therefore, boils down to a determination of which state's law should be applied. *See, e.g., National Surety Corp. v. Inland Properties, Inc.,* 286 F.Supp. 173, 187 (E.D. Ark.1968), *aff'd,* 416 F.2d 457 (8th Cir.1969).

The leading modern Arkansas case dealing with choice-of-law is *Cooper v. Cherokee Village Development Co.,* 236 Ark. 37, 364 S.W.2d 158 (1963). In that case the borrower was an Arkansas corporation with its principal place of business in Arkansas. The lender was a New York corporation with its principal place of business in New York City. The loan called for interest in excess of ten percent per annum and, therefore, ran afoul of the Arkansas interest limitation. The rate was, however, less than that permitted by the laws of New York. The payment of the loan was secured by a pledge of installment contracts for the purchase of Arkansas real property. The loan was negotiated both in Arkansas and New York. The agreement provided that the laws of the state of New York should govern the contractual rights and duties of the parties. The loan was to be paid in New York. The financing statements to perfect the lien were filed in Sharp County, Arkansas, and with the Arkansas Secretary of State.

The Supreme Court noted that it had always been inclined towards applying the law of the state that would make the contract valid rather than void and held that New York law controlled:

> In determining what law governs the validity of a multistate contract four different bases have been used: (1) the law of the state in which the contract was made; (2) the law of the state in which the contract is to be performed in its most essential features; (3) the law of the state which the parties intended to govern the contract, provided that state has a substantial connection with the contract; and (4) the law of the state which has the most significant contract [sic] with the matter in dispute [also known as the "center of gravity" or "grouping of contacts" theory].

> Arkansas has, on different occasions, applied the first three of these theories. [Citations omitted]. The "center of gravity" theory, which appellant urges upon us, was inaugurated in *Auten v. Auten,* 308 N.Y. 155, 124 N.E.2d 99. This court has not found occasion to employ it nor do we now find it necessary in this case.

> From a review of the facts in this case we are of the opinion that upon the application of any of the three traditional rules, recognized by this court, that the law of New York is controlling. . . .

> This is not a case of a cloak for usury or where the parties to a wholly Arkansas contract have sought to avoid the Arkansas usury law by having the validity of the contract determined by the law of a state having no substantial connection with the contract. On the contrary, this is essentially a New York contract. It is quite natural for a New York lender to loan its money in New York, to require it to be repaid in New York and to stipulate that the contract be governed by familiar New York law. These are *reasonable requirements* for a lender to exact.

*Id.* 236 Ark. at 42–45, 364 S.W.2d 158.

Since *Cherokee Village,* the history of the Arkansas cases dealing with the contractual selection of a particular state's law in in-

stances of alleged usury has basically been one of application of its doctrine. Thus, it has been held on numerous occasions that the parties to a contract may select the law which they intend to govern the contract, provided that the state whose law is chosen has either a "substantial connection with" or a "reasonable relationship to" the transaction in issue. *See, e.g., Lyles v. Union Planters National Bank of Memphis*, 239 Ark. 738, 393 S.W.2d 867 (1965); *Wilkins v. M & H Financial, Inc.*, 476 F.Supp. 212 (E.D.Ark.1979), *aff'd*, 621 F.2d 311 (8th Cir. 1980); *National Surety Corporation*, 286 F.Supp. 173 (E.D.Ark.1968), *aff'd*, 416 F.2d 457 (8th Cir.1969). As stated in *National Surety Corporation: "Cooper* makes it clear that parties have a right to contract as to governing law so long as the chosen body of law bears a reasonable relationship to the contract." 286 F.Supp. at 190. *See U.S. Manganese Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 576 F.2d 153 (8th Cir.1978).

Two recent decisions from the Arkansas Supreme Court, however, suggest a possible departure from the previously well-settled doctrine of *Cherokee Village*. In *Standard Leasing Corp. v. Schmidt Aviation*, 264 Ark. 851, 576 S.W.2d 181 (1979), the Arkansas Supreme Court dealt primarily with the issue of whether an instrument that appeared to be a lease was in fact a contract for a credit sale of merchandise. However, the last paragraph of the opinion contains a ruling that the contract is governed by the law of Arkansas despite the recitation in the contract that it was the parties' intent that the law of Tennessee govern:

> Finally, we cannot sustain the argument that the contract is governed by the law of Tennessee, as the instrument recites, rather than by the law of Arkansas. To begin with, counsel have not cited any authority holding that this transaction would be recognized as a genuine lease in Tennessee. But, apart from that, the principal significant contacts occurred in Arkansas. *See* Leflar, American Conflicts Law, § 147 (1968). The seller sent its representatives to Arkansas, where the actual sale occurred. The Arkansas

sales tax was paid. The air compressor was delivered and installed by the seller in Arkansas. Efforts by the seller to repair it were made in Arkansas. It may have been accepted and approved in Memphis, where Standard Leasing has an office, although the testimony is not positive on this point. Schmidt, however, made the mistake of signing the original instrument both as a lessor and as lessee. Standard Leasing then retyped the contract and returned it to Schmidt for reexecution. Thus, the contract was finally consummated in Arkansas, though we do not regard that fortuitous fact as being of controlling importance. Essentially it was an Arkansas contract, governed by Arkansas law.

The Arkansas Supreme Court again addressed the contractual selection of law issue in *Tri-State Equipment Co. v. Tedder*, 272 Ark. 408, 614 S.W.2d 938 (1981). The facts in *Tri-State* were as follows:

> In early June, 1979, Tedder contacted a representative of Tri-State in Jonesboro concerning the lease of a ... front end loader. Tri-State's representative met with Tedder at Paragould and placed an order for the equipment for a two-day trial demonstration. Tedder decided to purchase the equipment and signed a "Note and Disclosure Statement" dated June 14, 1979, which provided that the contract was to be governed by Arkansas law. Later, the parties signed a "Security Agreement (Conditional Sale Contract)" dated June 28, 1979, which provided that the contract was not to take effect until it was accepted by Tri-State's office in Memphis and that the contract was to be governed by Tennessee law. Tedder maintain[ed] that this was when he learned that Tri-State was not located in Jonesboro but in Tennessee.... [Tri-State conceded] that if Arkansas law applied, the contract [would be] usurious and void.

*Id.* The evidence was uncontroverted that "all of the negotiations surrounding the transaction were conducted in Arkansas— the equipment was ordered and delivered in

Arkansas, the contract was signed in Arkansas, Tedder's trial and approval occurred in Arkansas, and the sales tax on the transaction was paid in Arkansas." *Id.* at 409, 614 S.W.2d 938.

In upholding the chancellor's conclusion that the "contract was an Arkansas contract and should be governed by Arkansas law," the Arkansas Supreme Court relied completely on its decision in *Standard Leasing*.[1] The Court, prior to reciting the bulk of the final paragraph in *Standard Leasing,* stated the following: "In an almost identical case, *Standard Leasing* . . . , this court held that a contract substantially executed and performed in Arkansas was in fact an Arkansas contract governed by the laws of this state, notwithstanding stipulations by the parties in the contract itself to the contrary." *Tri-State,* 272 Ark. at 409, 614 S.W.2d at 939. The court made no mention of *Cherokee Village* or its progeny.

In *Wilkins v. M & H Financial, Inc.,* 476 F.Supp. 212 (E.D.Ark.1979), *aff'd,* 621 F.2d 311 (8th Cir.1980), the Honorable Elsijane Roy addressed the *Standard Leasing* decision and rejected the contention that it overruled *Cherokee Village* by demanding the application of the "center of gravity" approach to the contract in issue. The *Wilkins* case involved a loan transaction between Wilkins (borrower) and M & H Financial (lender). The bulk of the transaction occurred outside of Mississippi, the state whose law was selected to govern the contract. The contract was, however, signed by the parties at the M & H Financial office in Southhaven, Mississippi (M & H Financial being a "lawfully incorporated creature of the State of Mississippi").[2] Additionally, the collateral for the loan was placed in the possession of M & H Financial in Mississippi. In holding that the law of Mississippi governed the transaction, Judge Roy stated the following:

The Wilkins' argument is, essentially, that the "center of gravity" theory should dictate the decision in this case. In *Cooper v. Cherokee Village, supra,* the Arkansas Supreme Court declined to adopt the center of gravity theory for a usury case. . . .

*Standard Leasing Corp. v. Schmidt Aviation* . . . is the most recent Arkansas usury case involving a conflicts issue. It is cited as authority for using the "center of gravity" approach to this contract. . . . [I]t might be argued that *Cherokee Village* was overruled by the *Standard Leasing* case; however, we do not think this is a correct conclusion upon careful analysis of the cases.

The authority cited in the *Standard Leasing* opinion is Leflar, American Conflicts Law, § 147 (1968). In this section of his treatise Dr. Leflar discussed the "center of gravity" approach. He noted that "[t]here is a real danger that a court will engage in a process of counting contacts, rather than evaluating them qualitatively." *Id.* at 366. The Arkansas court was not guilty of this abuse in the *Standard Leasing* case. The significance of that decision is the requirement (at least where the sale of goods is concerned) that the place of making or the place of performance be *significant* and not merely fortuitous or the result of a skillful use of contract language and the United States Mail.

The *Standard Leasing* opinion cannot be read to limit the right of an individual to exercise business judgment in borrowing money at more than 10% when the parties involved take deliberate, effective, and bona fide steps to take the transaction outside the scope of Arkansas

---

1. The Arkansas court cited no cases in support of its decision in the *Standard Leasing* case. Similarly, the lone citation in *Tri-State* was to *Standard Leasing.*

2. The documents evidencing the indebtedness of the Wilkinses to M & H Financing were signed on September 7, 1976. On that day, Wilkins drove to Malone & Hyde offices in Memphis, Tennessee, and met with officers of Malone & Hyde who were also officers of M & H Financial. After the Wilkinses gave a $3,000.00 check to Malone & Hyde, they were driven in a Malone & Hyde automobile to the M & H Financial office in Southhaven, Mississippi, which borders Memphis. There the documents were signed.

law as was done by Mr. Wilkins. This would be in conflict with the holding in *Cherokee Village*.

*Id.* at 218–219.[3] Judge Roy concluded that the contacts with Mississippi were "significant and were not merely fortuitous." According to Judge Roy, "the place the papers were signed was not inconsequential. Only in Mississippi could the Wilkins obtain the financing they needed to open their store. After they were denied the desired financing in Arkansas, they actively sought to obtain the loan in the foreign jurisdiction." *Id.* at 220.

The decision in *Wilkins* was affirmed by the Eighth Circuit Court of Appeals on the basis of the district court's "more extensive and well-reasoned opinion on this issue." *Wilkins v. M & H Financial, Inc.*, 621 F.2d 311, 312 (8th Cir.1980). The Eighth Circuit specifically agreed that *Cherokee Village* was not overruled by *Standard Leasing* and that "under Arkansas choice of law rules the substantive law of the foreign state will apply when the parties so intend, and there is a substantial connection between the foreign state and the contract." *Id.* at 312. *See U.S. Manganese Corp.*, 576 F.2d 153.

This Court has uncovered no case discussing the more recent *Tri-State* decision. In the Court's view, the decision can be treated in one of two ways. First, the case can be viewed as adopting the "center of gravity" approach to all choice of law questions involving the usury issue. This interpretation, of course, requires a departure from the holding in *Cherokee Village*. Second, it may be treated as a determination by the Arkansas Supreme Court that the contacts with the state whose law was chosen were not "substantial."

■ The Court must reject the first interpretation. In view of the importance of the *Cherokee Village* decision, its widespread adoption, and the recent decision of

*Wilkins v. M & H Financial*, 476 F.Supp. 212 (E.D.Ark.1979), aff'd, 621 F.2d 311 (8th Cir.1980), the Court is unable to hold that it was the intent of the Arkansas Supreme Court to implicitly reject the well-settled rule that parties have a "right to contract as to governing law so long as the chosen body of law bears a reasonable relationship to the contract." *National Surety Corporation*, 286 F.Supp. at 190. Such a significant departure would not, in the Court's view, take place without so much as a citation to those cases expounding the rejected doctrine.

The Court, therefore, concludes that the *Tri-State* case represents an implicit determination that Tennessee had no "substantial connection" with the transaction held to be usurious. In reaching this decision, the Court recognizes that the Arkansas court made no mention of the possible "substantial connection" between the transaction and Tennessee, but, rather, concentrated on the transaction's affirmative contacts with Arkansas. However, because the Court is convinced that *Cherokee Village* remains the law of Arkansas, the Court concludes that the absence of a "substantial connection" provided the basis for the Arkansas Supreme Court's decision.

Since *Cherokee Village* remains the law of Arkansas, the Court must, in the instant case, determine whether Georgia had a "substantial connection with" or a "reasonable relationship to" the contract in issue. The appellant argues that it did not. According to the appellant, the approval and acceptance in Atlanta was not necessary to effectuate the contract, but rather was an "egregious sham to avoid the Arkansas usury law." The appellant contends that this is evidenced by the failure of the Atlanta office of CIT to ever reject a contract from its divisional office in Memphis.

---

**3.** Judge Roy also expressed doubts "concerning the constitutionality of interpreting the Arkansas usury statute in such a way that loan contracts executed in other states and valid there are declared illegal under Arkansas law." According to Judge Roy, "[t]his would seem to be an unreasonable application of the Arkansas

law, where, as here, the agreements were made in the foreign state voluntårily and knowingly by intelligent and mature businessmen with complete disclosure of the amount of interest to be charged." *Id.* at 219–220 n. 1. In view of the court's determination in the instant case, this issue need not be addressed.

The appellee, of course, disagrees. According to the appellee, there was, in fact, a "substantial connection" with the state of Georgia. The appellee points out that Atlanta is the home office and principal place of business of CIT; that CIT finally accepted and executed the transaction documents there; that no monies were dispersed until such acceptance in Georgia; and that the note was to be repaid there.

In directing a verdict for the appellee in this case, the Bankruptcy Court applied the rationale espoused in the *Cherokee Village* case. Since there was no question but that the contract expressly provided that the law of Georgia would apply, the Bankruptcy Court sought to determine whether Georgia had a "substantial connection with" the instant transaction. The court had little difficulty reaching a decision:

> And, of course, the court finds that there was a significant event here when this contract was finally approved; that is, the solicitation of it was in Arkansas, but it was not finally approved until it reached the Atlanta level. There was a significant event in this case ... (A) significant part of this relationship ... transpired in Atlanta.[4]

█ The Court agrees with the finding of the Bankruptcy Court. CIT's principal place of business was Atlanta, Georgia, the city in which it was headquartered. The final acceptance and execution of the transaction between Bice and CIT occurred in Atlanta,[5] as contemplated by the express language of the contract. Additionally, the note was to be repaid in Atlanta. In view of these contacts, the Court concludes that Georgia did, in fact, have a "substantial connection" with the transaction in issue. *See U.S. Manganese Corp.,* 576 F.2d 153; *Wilkins,* 476 F.Supp. 212, *aff'd,* 621 F.2d 311. The Court has found no reported Arkansas case branding a transaction usurious where the contract documents were finally, and non-fortuitously, entered into by the lender in its home state and such documents specifically provided for the application of that state's law.[6]

---

4. The Bankruptcy Court also determined that it was not CIT's strict intent to avoid the usury laws of Arkansas. In the Court's view, this determination was unnecessary.

This Court recognizes that Arkansas has a strong public policy against usury. *Huchingson v. Republic Finance Co., Inc.,* 236 Ark. 832, 370 S.W.2d 185 (1963). However, as for a party's mere intent to avoid the state's usury laws, the Court agrees with the words of the Honorable J. Smith Henley in *National Surety Corporation,* 286 F.Supp. 173:

> The argument is made that the procedure adopted was merely a "device to evade" the usury laws of Arkansas and should not be permitted to have that effect in view of Arkansas' strong public policy against usury. The Court thinks that the same argument could have been made, and perhaps was made in *Cooper.* In the light of the holding in *Cooper* and in the light of the facts in this case the argument is unsound.
>
> It is true, of course, that whenever contracting parties stipulate that their contract is to be governed by the law of one State rather than by the law of another State, or whenever they consciously act in a matter so as to bring into play the law of one State in preference to the law of another State, it may be said that their stipulation or conduct is a "device to evade" the law of the other State, but do so characterize their stipulation or conduct does not invalidate it. *Cooper*

makes it clear that parties have a right to contract as to governing law so long as the chosen body of law bears a reasonable relationship to the contract.

*Id.* at 189–190. *See Wilkins v. M & H Financial, Inc.,* 476 F.Supp. 212, *aff'd,* 621 F.2d 311. *See also Lyles v. Union Planters National Bank,* 239 Ark. 738, 393 S.W.2d 867 (1965).

In view of the above, the Court need not decide whether CIT's intent was to avoid the usury laws of Arkansas. It is sufficient that Georgia bore a "reasonable relationship" to the instant transaction. *See infra.*

5. Though the Atlanta office had, in the past, never rejected a properly submitted contract, no monies were disbursed until the contract was accepted by the Atlanta office. The Court concurs with the Bankruptcy Court's finding that the contract in issue was not complete until this final acceptance. *See Huchingson,* 236 Ark. at 834–835, 370 S.W.2d at 187.

6. The appellant argues that *Tri-State Equipment v. Tedder,* 272 Ark. 408, 614 S.W.2d 938, represents such a decision. The Court disagrees.

The transaction in *Tri-State,* as in *Standard Leasing,* 264 Ark. 851, 576 S.W.2d 181, lacked the "deliberate, effective and bona-fide steps to take the transaction outside the scope of Arkansas law." *Wilkins,* 476 F.Supp. at 219. In-

The Court concludes that the Bankruptcy Court was correct in holding that Georgia law governs the instant transaction. There exists a definite agreement between the parties that the instrument be "interpreted and the rights and obligations of the parties . . . be governed by the law of the State of Georgia." Additionally, Georgia had a "substantial connection with" and a "reasonable relationship to" the disputed transaction.

It is therefore Ordered that the judgment of the Bankruptcy Court be, and it is hereby, affirmed.

deed, the borrower maintained that it was not until the security agreement was signed that he became aware that Tri-State was located in Tennessee rather than in Arkansas, (the "Note and Disclosure Statement" signed two weeks earlier having provided that the contract was to be governed by Arkansas law).

Additionally, the contract in *Tri-State,* unlike the contract in the instant case was finally executed in Arkansas. Though the contract contained a provision that it was not to take effect until it was accepted by Tri-State's office in Memphis, the Arkansas court does not state what weight, if any, was given to this provision. *See Huchingson,* 236 Ark. at 834–835, 370 S.W.2d at 187.